STATE OF CONNECTICUT *v.* G. LeROY KEMP.

MALTBIE, C. J., HINMAN, AVERY, BROWN and JENNINGS, JS.

62

Argued October 11—decided November 16, 1939.

*John Keogh* and *John Keogh, Jr.,* for the appellant (defendant).

*Lorin W. Willis,* state's attorney, with whom was *Richard F. Corkey,* special assistant state's attorney, for the appellee (the State).

MALTBIE, C. J.  The defendant was tried and found guilty upon a grand jury indictment in two counts charging that, while acting as the agent of the highway commissioner in the purchase of land for the state, he fraudulently agreed to receive, and did receive, a share of the commissions of two agents who represented the sellers of certain lands. He was tried, found guilty and sentenced for the crime of conspiracy. The two brokers arrested under the indictment were not put to trial with the defendant.

The defendant, by motions to quash and dismiss, attacked the validity of the indictment because of certain irregularities he claims to have occurred in the conduct of the grand jury investigation out of which the indictment grew. In the constitution and statutes of this state, there is no requirement that one accused of crime shall be charged by indictment except the constitutional provision that "no person shall be holden to answer for any crime, the punishment of which may be death or imprisonment for life, unless on a presentment or an indictment of a grand jury." Connecticut Constitution, Article First, § 9. Had the indictment in this case been quashed or dismissed, the state's attorney could have immediately filed an information charg-

ing the offenses contained in it and the accused would have been arraigned and tried and doubtless convicted in exactly the same manner that he was. It is, therefore, a fair query whether he could be held to have been injured by any defects in the proceedings of the grand jury. In view of the nature of the proceedings, however, we pass that question to consider the substance of his claims.

The trial court itself selected those who were to serve upon the grand jury and directed the sheriff to summon them. At common law the grand jury were "returned by the sheriff or other proper officer without the nomination of any other person whatsoever." 2 Hawkin, P. C., Chap. 25, § 16; 1 Chitty, Criminal Law, 310. While most of the states have now enacted statutes governing the selection and summoning of a grand jury, we have none in this state and until recently, so far as we know, have followed the common-law practice. There is, however, nothing sacrosanct in a common-law rule of procedure, and where to follow it would be likely to defeat the ends of justice, it may and should be modified or abrogated. Obviously to leave the selection of the members of a grand jury to a sheriff, an elective officer responsible to no higher authority, might, in a situation where matters to be considered had aroused public passion or where he himself had an interest in the outcome of the proceedings, defeat the very purpose of a grand jury investigation. The record is silent as to the reasons which actuated the trial court, but the nature of the offense and the scope of the trial are such as to indicate that it may well have had good ground for the course it took. While in most cases the old procedure should no doubt be followed, we cannot, upon this record, find that the trial court erred in itself selecting the members of the grand jury.

The defendant also claims irregularity in the conduct of the grand jury investigation in that the state's attorney and his assistants were permitted to be present in the grand jury room and to aid it in the examination of witnesses. In 1815 the Supreme Court, not in a decision but merely stating an approved practice, outlined certain instructions to be given the grand jury, which included a provision that no counsel for the state should be present with them. *Lung's Case,* 1 Conn. 428. At common law it was not unusual for the prosecutor to be present and examine witnesses before a grand jury, except in the King's Bench, where the clerk of the grand jury attended; 1 Chitty, op. cit., 317; and the exclusion of the prosecutor is traced by Davis to causes never operative in this state. Davis, Precedents of Indictments, 23. Indeed, in colonial days in this state a grand jury were sworn to keep the secrets of "the King's Counsel" as well as their own and that of their fellows. Acts and Laws of 1750, p. 177. In other states it has been held, without reference to any statutory authority, that the prosecutor may be present before the grand jury for the purpose of aiding it in the examination of witnesses. *In re District Attorney of United States,* 7 Fed. Cas. No. 3925; *United States* v. *Kilpatrick,* 16 Fed. 765, 770; *Gitchell* v. *The People,* 146 Ill. 175, 187, 33 N. E. 757; *Shattuck* v. *State,* 11 Ind. 473, 475; *Le Barron* v. *State,* 107 Miss. 663, 673, 65 So. 648; *Commonwealth* v. *Bradney,* 126 Pa. St. 199, 205, 17 Atl. 600; *Shoop* v. *The People,* 45 Ill. App. 110, 111; *State* v. *Brewster,* 70 Vt. 341, 40 Atl. 1037. In *State* v. *Baker,* 33 W. Va. 319, 321, 10 S. E. 639, the presence of the prosecuting attorney in the grand jury room was held to be proper under common-law principles, after a statute expressly authorizing him to attend had been repealed, the court remarking that the statute made it the duty of the prosecuting attor-

ney to attend rather than leaving it permissible and that its repeal may have evidenced an intent to leave the matter to be determined upon the principles of the common law; and this decision aptly answers the defendant's argument that the rejection by our own Legislature of proposed statutes giving the state's attorney the right to attend upon the grand jury indicated an intent that he should always be excluded. That no serious harm is liable to result from such a practice is indicated by the fact that it is quite. generally authorized by statute or court decision, although it is also generally held that the prosecuting attorney should not be present during the deliberations of the jury. 28 C. J. 802. *Lung's Case,* supra, was an accusation of first degree murder and therefore within the constitutional requirement of an indictment. As applied to such a case, we have no disposition to question that the charge there approved should be followed in this respect, at least in the absence of unusual circumstances. The grand jury in the present case did not have laid before it an indictment charging any particular individual with having committed a crime but was impaneled to investigate the situation growing out of a question whether crimes had been committed in connection with the very large purchases of land made necessary by the establishment of the Merritt Parkway, and the case presents a different situation.

In the revision of the laws of 1750, an earlier statute was amplified to provide that the grand jury of each town should meet at certain intervals "to advise concerning such breaches of law as by their office they are to enquire after, and present," and for that purpose they were given power to summon witnesses. Acts and Laws of 1750, p. 84; Statutes of 1808, p. 372, note. In 1784 the Superior Court and the County Courts were authorized to order a grand jury of eighteen of those

chosen in the respective towns "to enquire after and present such criminal offences as should be cognizable by said courts respectively, where there shall be occasion." Laws of 1784, p. 93. With minor changes of no present moment, that continues to be our law. Revision of 1930, § 6430. The provision for the summoning of a grand jury by the Superior Court and County Courts was evidently designed to give to that body when so summoned much the same functions as regards offenses cognizable by those courts as had been earlier given to the meetings of grand jurors in their respective towns. The impaneling of a grand jury for such a purpose has been approved by the Supreme Court of the United States: "We deem it entirely clear that under the practice in this country, at least, the examination of witnesses need not be preceded by a presentment or indictment formally drawn up, but that the grand jury may proceed, either upon their own knowledge or upon the examination of witnesses, to inquire for themselves whether a crime cognizable by the court has been committed; that the result of their investigations may be subsequently embodied in an indictment, . . . So valuable is this inquisitorial power of the grand jury that, in states where felonies may be prosecuted by information as well as indictment, the power is ordinarily reserved to courts of impanelling grand juries for the investigation of riots, frauds and nuisances, and other cases where it is impracticable to ascertain in advance the names of the persons implicated." *Hale* v. *Henkel,* 201 U. S. 43, 65, 26 Sup. Ct. 370.

There is, however, a distinction between the function of the grand jurors meeting in their respective towns and a grand jury summoned to attend upon the Superior Court. The former were an independent body but the latter act under the supervision of the court and by immemorial practice they are given the oath

provided by the statute in open court, and the court charges them upon their duties. The form of oath in use now and for some two hundred years previously has required the grand jury to make presentment "according to your charge." A grand jury is, generally speaking, restricted to an inquiry into such matters as are laid before it by the court in its charge or those related thereto; 2 Wharton, Criminal Procedure (10th Ed.) § 1264; although it is always its right, should knowledge come to it of other situations which it thinks should be investigated, to ask the court for further instructions. 2 Wharton, op. cit. A grand jury, in investigating a situation laid before it by the court, may find itself confronted with the need to carry on a far-reaching inquiry and to secure and review much testimony, oral and documentary. Successfully to perform its duty may well require the assistance of a lawyer experienced in investigating criminal cases and presenting evidence in an orderly and intelligible manner. When such a situation occurs, the grand jury is entitled to receive that assistance. This was apparently the situation in the case before us and the trial court could properly, in its discretion, charge the jury that it was entitled to the aid of the state's attorney and his assistants if that proved necessary.

It is true that it is of great importance to preserve secrecy in regard to the conduct of a grand jury investigation. *State* v. *Fasset,* 16 Conn. 457, 467; *State* v. *Hamlin,* 47 Conn. 95, 115; *McCarthy* v. *Clancy,* 110 Conn. 482, 506, 148 Atl. 551. The purpose of the requirement of secrecy is to prevent the knowledge of matters taking place in the grand jury room from reaching others than those having an official part in the proceedings. The state's attorney and his assistants are just as much bound to preserve that secrecy as are the members of the grand jury. *State* v. *Fasset,*

supra, 471; *Gitchell* v. *The People,* supra, 187. While not definitely sworn to secrecy, it is peculiarly true in this jurisdiction that no assumption may be made that these high officers of the court would be forgetful of the obligation which this court has specifically held to rest upon them. *United States* v. *Kilpatrick,* supra; Davis, op. cit., 19. The objection that the presence of the state's attorney and his assistants is in violation of the principle of secrecy would apply equally to the presence in the grand jury room of a magistrate there to swear witnesses, which in *State* v. *Fasset,* supra, we said was permissible under our law, and of an interpreter, whose presence we approved in *State* v. *Chin Lung,* 106 Conn. 701, 721, 139 Atl. 91. That by reason of his presence, the state's attorney may acquire information which will aid him in the prosecution of any indictment which may be returned, is regarded by one able commentator as in itself an ample justification for the practice. Davis, op. cit., 18, and following.

The defendant also contends that it was improper to have present in the grand jury room a stenographer to take down the testimony of witnesses. Upon the question of the propriety of a stenographer attending a grand jury, courts have reached various conclusions. This is true of the federal courts, some of whose decisions, rendered since Congress in 1906 passed a statute regulating grand jury proceedings, the defendant cites in support of his contention. *United States* v. *Goldman,* 28 Fed. (2d) 424, 427. In *Wilson* v. *United States,* 229 Fed. 344, 348, the United States Circuit Court of Appeals for the Second Circuit, refusing to disapprove a long-continued practice which had been followed in that circuit to permit stenographers to be present with grand juries, stated that: "To do so would seem like a reverter to strict technicalities, overattention to which sometimes tends to defeat rather

than to advance the ends of justice. There seems no reason why criminal law and procedure should not, like other law and procedure, progress with the progress of the age. . . . We are satisfied that the preservation of an accurate record of the testimony submitted to a grand jury tends to advance the ends of justice. The knowledge that there is being taken a record of such sort that, in any future prosecution for perjury, it will probably be taken by a trial jury as a correct one is a wholesome check on the witnesses who are testifying before a grand jury. There are very many causes which come before a grand jury which involve complicated questions and call for voluminous testimony from many witnesses. It cannot all be put in at once; not infrequently the statement of one witness will indicate where another witness may be found and days or weeks may elapse before he can be produced. The recollection of the sixteen [sic] jurors may not always be harmonious as to what some prior witness testified to; it is important and advances the ends of justice always to have before the grand jurors themselves when they deliberate on their future action an accurate record of all the testimony which a stenographic report alone can give; it is as important for the person charged as it is for the government; it may save him from indictment through misrecollection." See also *State* v. *Brewster,* supra, 349, disapproving the contrary view taken by the Supreme Court of Maine in *State* v. *Bowman,* 90 Me. 363, 38 Atl. 331. It should be noted that, unlike the situation present in most of the cases considered by other courts, the trial court in this case instructed the jury that they might have the assistance of the official or assistant official stenographers of the court. These persons are officers of the court, responsible to it, and paid directly by the state. They are public officials. They were as much bound to

secrecy as is the state's attorney. The same considerations which in *State* v. *Chin Lung,* supra, led us to approve the presence in the grand jury room of an interpreter for witnesses speaking foreign languages, justify the presence of an official stenographer or his assistant where the grand jury finds it necessary to have a transcript of the evidence made.

In its charge the trial court instructed the jury that in interrogating witnesses neither they nor the state's attorney were bound by any rules of evidence. The grand jury did not have laid before it an indictment charging an individual or individuals with the commission of a specific crime, but was charged with the duty of investigating a certain situation where it was suspected that criminal acts had taken place. To restrict a grand jury, in carrying on an investigation of this kind, to eliciting only such testimony as would be admissible in court, would greatly impair its ability to ferret out criminal conduct, and we know of no principle of law which requires that while in pursuance of such an inquiry it is bound by the rules of evidence. As applied to the situation then before the court, the charge was correct as far as it went. When a grand jury is considering an indictment laid before it, charging an individual or individuals with a specific crime, it should no doubt restrict the evidence it elicits to that which is admissible in the trial of cases; *United States* v. *Rubin,* 218 Fed. 245, 246; *United States* v. *Kilpatric,* 16 Fed. 765, 771; 2 Wharton, Criminal Procedure (10th Ed.) § 1291; and when it is engaged in a general investigation it should return an indictment against an individual or individuals only when that indictment is justified by such evidence. In this case the trial court might well have amplified its charge to meet this latter situation. But even if it did not fully instruct the grand jury as to this matter, the defendant

is in no position now to take advantage of that failure. He made no such claim in the motions to quash or dismiss and it is too late now for him to do so; for, had the question been raised and the indictment declared invalid on that account, the state's attorney, as we have already noted, might have immediately filed an information in place of the indictment and proceeded with the trial.

The defendant appeared before the grand jury as a witness in answer to a subpoena and testified. He contends that thereby he was denied the immunity guaranteed under the constitutional provision that in all criminal prosecutions, "the accused . . . shall not be compelled to give evidence against himself." Connecticut Constitution, Article First, § 9. He now claims that he was forced to give evidence by threats and intimidation. No facts are found, however, to support the latter contention, nor could we, as requested, add them to the finding, beyond this, that when he appeared he refused to testify and was then threatened with proceedings in contempt if he did not do so. This fact is without significance, however, because he filed at that time a written protest against testifying, which was founded upon some of the defects in the grand jury proceeding which we have considered and others not now pressed and was silent as to any claim that he had immunity from testifying. The immunity guaranteed by the constitution no doubt extends to proceedings before a grand jury. *Counselman* v. *Hitchcock*, 142 U. S. 547, 12 Sup. Ct. 195; *Hale* v. *Henkel*, supra; *Emery's Case*, 107 Mass. 172, 181; *State* v. *Gardner*, 88 Minn. 130, 136, 92 N. W. 529. That immunity does not, however, at least in a situation where a grand jury is carrying on a general investigation, protect a person from being summoned before it and questioned, but it only gives him the right to claim immunity from

answering any particular question which may be put to him.

Of the Fifth Amendment to the United States Constitution, the Circuit Court of Appeals of the Second Circuit, in words equally applicable to the provision in our own constitution, citing numerous cases, has said: "The final contention of the appellant is that, regardless of the details of his examination, it was a violation of his rights under the Fifth Amendment to require him to be sworn and examined before the grand jury, because its investigation, though ostensibly general, was in reality an attempt to secure from his own mouth evidence upon which to indict him. Some judicial support may be found for such a view. . . . But it has not prevailed generally. . . . As Professor Wigmore has aptly said, the constitutional provision is 'an option of refusal, and not a prohibition of inquiry.' Were it otherwise, any suspect would be sacrosanct, and witnesses most likely to know the facts could refuse any aid to an investigation of the crime. The mere summoning of a witness before a grand jury gives no basis for the assumption that his constitutional privilege will be impaired. His duty is to answer frankly until some question is propounded, the answer to which might tend to self-incrimination." *O'Connell* v. *United States,* 40 Fed. (2d) 201, 205. In addition to the cases cited in that opinion, see *Emery's Case,* supra; *People* v. *Lauder,* 82 Mich. 109, 119, 46 N. W. 956; *State* v. *Comer,* 157 Ind. 611, 613, 62 N. E. 452; *State* v. *Donelon,* 96 La. 744, 746; *In re Lemon,* 15 Cal. App. (2d) 82, 85.

When the defendant filed his written protest against testifying, the grand jury returned to the court for further instructions and the trial court charged it that no man could be compelled to answer a question if he believed that to do so would incriminate or degrade

him and that if any witness made such a claim the jury was not to press the question. We must assume, and in fact the defendant so testified, that thereafter in his examination he exercised his privilege to refuse to answer questions which he believed would tend to incriminate him and that his claim of immunity was fully recognized. He received all the benefit of the constitutional guarantee to which he was entitled. He also claims that his rights were invaded because his books, papers and records were brought before the grand jury upon a subpoena duces tecum. With reference to his right to refuse to produce papers relevant to the inquiry upon such a subpoena, the same principle applies as that which we have just stated. See *Corretjer* v. *Draughon,* 88 Fed. (2d) 116. He sought to have the finding amplified to state that the books, records and papers were taken from his office by the officer who served the subpoena. The subpoena no doubt followed the usual form, directing the defendant to appear before the grand jury with the books, papers and records. Apparently, instead of doing this, he surrendered them to the officer. This in effect constituted a voluntary submission of the documents to the grand jury and a waiver of the right to any claim to immunity which he might have asserted had he appeared with them in person.

The defendant moved for a change of venue upon the ground of the great publicity which had been given to the matter out of which the prosecution grew and to his own connection with it in newspapers circulating in the county where the trial was had, but the court denied the motion. The granting or denial of a motion for a change of venue rests in the discretion of the trial court and can be found erroneous only when there has been a clear abuse of that discretion. *State* v. *Luria,* 100 Conn. 207, 209, 123 Atl. 378; *State*

v. *Rocco,* 109 Conn. 571, 572, 145 Atl. 47; *State* v. *Chapman,* 103 Conn. 453, 470, 130 Atl. 899. In the case last cited, where a claim substantially similar to the one now made was advanced, we said (p. 471), in language equally applicable here: "The record shows that, in fact, the accused had, under our rules of law, a fair and impartial trial, and that he was accorded all the rights which our law gave him. It is difficult to conceive of a case where a reversal should be granted upon a refusal to order a change of venue after the case has been tried, every right of the accused protected, and a fair and impartial trial accorded him."

The jury might reasonably have found the following facts: At and before the time of the occurrence now in question, the defendant was an experienced real estate broker. In 1932 he was employed by the highway commissioner of the state in connection with the purchase of lands made necessary by the layout and construction of the Merritt Parkway through Fairfield County. It was agreed that he should be paid at the rate of $15 per day and reimbursed for expenses he incurred but he was not required to devote all his time to his employment by the state. During the some six years of that employment he received about $24,000 from the state as compensation. In his work he was known as the state purchasing agent and was the only agent acting in this capacity in connection with this highway. It was his duty to negotiate with the owners of the lands needed for the highway or their agents for their purchase by the state. He had no authority actually to buy any land; his function was to arrive at an agreement as to the price for which it could be bought; this he submitted to the officers of the department for their approval; and if the price agreed upon was satisfactory the purchase was ultimately consummated by representatives of the attorney general.

Great confidence was reposed in him and his recommendation that a certain sum be paid for a tract of land was usually accepted without question. In negotiating for the purchase of lands he dealt with numerous brokers representing the owners. Most of these brokers had only one or a very few properties in their hands and the two who had more than any of the others were Samuel H. Silberman and Thomas N. Cooke. Silberman did business in the name of a corporation, all the stock of which he owned, and Cooke did business as a corporation, 70 per cent. of which he owned and which he controlled. Each of them, previous to the defendant's employment by the state, had been accustomed to divide commissions with him where both were instrumental in bringing about a sale of property.

About January, 1933, when the defendant was negotiating with Silberman for the purchase of a certain tract of land, he stated to the latter that he thought he was entitled to the usual share where brokers divide a commission and Silberman agreed that he was, but no specific amount was mentioned. Thereafter in all transactions in which Silberman acted as a broker for the owners of the land sold to the state, thirty-seven in all, Silberman paid the defendant a substantial share of the commissions he received, in most instances one-half of the amount, except that in some cases deductions were made for expenses and the like. In each instance Silberman paid whatever he thought the defendant was entitled to receive and the latter accepted that sum without protest. About a year after his first transaction with Silberman, the defendant negotiated for the first purchase in which Cooke acted as a broker. The defendant offered to give Cooke "leads" on property the state would need if the latter wanted to work with him and suggested that they share the commis-

sion on the same basis as they had been doing as regards transactions with private buyers. Thereafter whenever a sale was made to the state through the defendant by owners represented by Cooke, nineteen in all, Cooke gave him one-half the commission after deducting the income tax Cooke expected to pay on that share, the expenses incurred in the transaction and certain sums owed to Cooke by the defendant in other matters, except in one instance where the amount of the commission which the defendant otherwise would have received was set off against amounts representing taxes which Cooke expected to pay and which had not been deducted from payments previously made to Cooke. The defendant thus received from Silberman some $28,000 and from Cooke some $15,000, and in fact on the witness stand he admitted receiving from the former $10,400 and from the latter $11,543.40. Except for the first three payments made by Cooke to the defendant, which were by check, all amounts turned over to the defendant by both the brokers were in cash, the sums at times amounting to several thousand dollars. The last payment made by Silberman was about April 6, 1937, and the last made by Cooke was about November 6, 1937. The defendant at no time informed any representative of the state that he was receiving these sums; he regarded them as personal receipts and did not turn them in to the corporation which he controlled and through which he carried on his real estate business; and the only record he kept of them was in a small personal memorandum book. There was no evidence that by reason of these payments to the defendant the state paid any more for the lands than it would otherwise have done.

In *State* v. *Parker*, 114 Conn. 354, 360, 158 Atl. 797, we quoted, with approval, from 12 C. J., p. 547, as follows: "In order that a combination may be punish-

able it must be formed to do either an unlawful act or a lawful act by criminal or unlawful means. . . . It is not essential, however, to criminal liability that the acts contemplated should constitute a criminal offense for which, without the elements of conspiracy, one alone could be indicted. It is an offense independent of the crime or unlawful act which is its purpose; and it will be enough if the acts contemplated are corrupt, dishonest, fraudulent, or immoral, and in that sense illegal. A conspiracy will be indictable if the end proposed or the means to be employed are, by reason of combination, particularly dangerous to the public interests, or particularly injurious to some individual, although not criminal." We pointed out in that case that the proposition so broadly stated is subject to certain limitations. Certainly it would not do to hold that whenever two persons combine to do an act which in a civil proceeding would be held to be illegal, they necessarily are subject to prosecution for a criminal conspiracy. *State* v. *Glidden*, 55 Conn. 46, 70, 8 Atl. 890; *Commonwealth* v. *Hunt*, 45 Mass. (4 Metc.) 111, 124; *Commonwealth* v. *Donoghue*, 250 Ky. 343, 347, 65 S. W. (2d) 3; 2 Wharton, Criminal Law (12th Ed.) § 1617. It is undoubtedly a breach of duty for a broker representing the buyer of real estate, without the knowledge of his principal, to agree with a broker representing the seller of the property to divide the commission which the latter might receive on account of the sale; *Tracey* v. *Blake*, 229 Mass. 57, 61, 118 N. E. 271; Restatement, 2 Agency, § 391 (c); but that wrong would not in itself justify the prosecution of the brokers for a criminal conspiracy. There is, however, in this case an additional and controlling element.

Section 6288 of the General Statutes provides that any person "being a public officer, trustee or agent," or a member of the board of management of any pub-

lic or private institution or corporation, who shall
receive for his own use, directly or indirectly, from any
person or corporation with whom he makes a contract
or transacts any business in such a capacity, or with
whom the board of management of which he is a mem-
ber makes a contract or transacts any business, any
payment, commission or compensation or a gratuity of
any kind, by reason of or in connection with the mak-
ing of such contract or the transacting of such business,
shall be imprisoned, fined or both. Certainly the de-
fendant was a public agent within the terms of this
statute and he took payments from persons with whom
he was transacting business, in the sense at least of
negotiating for the purchase of property for his prin-
cipal, the state. The Legislature has seen fit to char-
acterize conduct of the nature of that defined in the
statute as so harmful to public interests that it is to
be prosecuted and punished as a crime. When the
conduct so condemned is that of an agent of the state
itself it becomes in a very real sense a public wrong.
The defendant's conduct certainly fell within the evil
it was designed to prevent and the statute serves to
characterize his acts in accepting the payments from
Silberman and Cooke as likely to result in serious harm,
not to individuals alone, but to the public interest.
His conduct falls within the words of the quotation
we have made from *State* v. *Parker,* "corrupt," "dis-
honest" and "immoral," and suffices to make the agree-
ments between him and Silberman and Cooke com-
mon-law conspiracies. *Commonwealth* v. *Waterman,*
122 Mass. 43, 58; *Smith* v. *The People,* 25 Ill. 17, 24;
*Commonwealth* v. *Donoghue,* supra.

In order to constitute a conspiracy it is not neces-
sary that there should be any formal agreement be-
tween the parties concerned. It is enough that there is
"a mutual purpose" to do the forbidden act; *State* v.

*Spalding,* 19 Conn. 233, 237; that there is "a common design"; *United States* v. *Rindskopf,* 27 Fed. Cas. (No. 16,165) 815; that there is a "concurrence of sentiment, and co-operative conduct in an unlawful and criminal enterprise." *McKee* v. *State,* 111 Ind. 378, 383, 12 N. E. 510. "It is well settled that a formal agreement of the parties concerned is not essential to the formation of a conspiracy. It is sufficient if there be concert of action, all the parties working together understandingly, with a single design for the accomplishment of a single purpose." *Fowler* v. *United States,* 273 Fed. 15, 19. In this case the jury might reasonably have concluded that each payment to the defendant was not an isolated incident but all were made in pursuance of mutual understandings which continuously operated throughout the course of the transactions. It was not necessary to prove a specific evil or corrupt intent on the part of the defendant but only that he intentionally committed acts constituting the criminal conspiracy. *United States* v. *Patten,* 226 U. S. 525, 543, 33 Sup. Ct. 141; *People* v. *Powell,* 63 N. Y. 88, 92. However, had it been necessary to prove a corrupt intent, it could well be inferred from the secrecy with which the defendant carried on his transactions with Cooke and Silberman. Where it is not inherent in the offense to the accomplishment of which the conspiracy is directed that there should be an intent to defraud or injure, it is not necessary, in order to constitute the crime of conspiracy, to prove such an intent. Thus in *State* v. *Allen,* 47 Conn. 121, 138, the conspiracy was one to break prison; in *State* v. *Glidden,* supra, the conspiracy was to compel an employer to discharge certain workmen; in *State* v. *Murphy,* 124 Conn. 554, 563, 1 Atl. (2d) 274, the conspiracy was directed to violations of the statutes against breach of the peace and intimidation; and for further instances of like

conspiracies, see 2 Wharton, Criminal Law (12th Ed.) § 1620 and following. That the money paid to the defendant by Silberman and Cooke came from corporations through which they did business is of no consequence; it was with these two men that the defendant transacted the business and in most instances it was by them or by someone else at their direction that the money was paid. The conspiracy with which the defendant was charged and of which he was convicted was not one specifically to violate the terms of § 6288 of the General Statutes but was to commit an unlawful act which the spirit if not the letter of the statute served to characterize as inimical to the public interests. The case does not fall within the principle that where a crime can only be committed by the concurrence of two parties, they must be charged with its commission and not with a conspiracy to commit it. *Gebardi* v. *United States,* 287 U. S. 112, 53 Sup. Ct. 35; 11 Am. Jur. 556; notes, 11 A. L. R. 196, 104 A. L. R. 1430.

There was no error in the ruling of the trial court refusing to set the verdict aside. In an appeal from the judgment the defendant claims error in the failure of the trial court to give certain requested instructions and in the charges given, but the errors claimed for the most part concern the matter of the defendant's status as an agent of the state; and in that connection the defendant seeks corrections in the finding with reference to such agency. As upon the undisputed facts the defendant was a public agent within the provisions of § 6288 of the General Statutes, the corrections in the finding sought and any incidental errors in submitting the issue of agency to the jury, as the trial court did, are of no consequence. *Puza* v. *Hamway,* 123 Conn. 205, 212, 195 Atl. 776. No change can be made in the finding which would be to the material

advantage of the defendant. The only claim of error in the failure to give requests to charge which requires discussion concerns the application of the Statute of Limitations, and that is later considered. Claims of error in the charge which do not concern the issue of agency are, with one exception, answered by what has been said. As to this, the conspiracy charged against the defendant was not one to violate the provisions of § 6288 of the General Statutes and it was not necessary to refer to that statute in the indictment. The form of the indictment was in substantial compliance with that suggested in § 311 of the Practice Book. If the defendant desired a more specific statement of the grounds upon which the indictment was based, he should have moved for it before or at the trial; Practice Book, § 302; not having done so, it is now, after verdict, too late to make this claim; *State* v. *McGee*, 80 Conn. 614, 617, 69 Atl. 1095; nor does it appear that this contention is anything more than a technicality which did not prejudice the defendant and therefore would not be ground for a new trial. Practice Book, § 309(d); *State* v. *Pallotti*, 119 Conn. 70, 73, 174 Atl. 74.

The finding contains numerous rulings on evidence to which the defendant took exception. Only one requires comment. When Silberman, called as a witness by the state, was being cross-examined, he was asked if he took drugs. On objection by the state, the trial court asked the defendant's counsel the purpose of the question, to which counsel answered that at all times the witness appeared to be very slow in answering questions. The court thereupon reprimanded counsel for that remark and adjournment for the day immediately followed. The trial court did not rule upon the admissibility of the question objected to; no answer was given; nor was the question ever repeated. In

any event, the question went only to the credibility of Silberman, and the defendant was not harmed because he admitted the essential elements of the transactions with him necessary to establish his violations of law.

The defendant makes much in his brief of what he claims to be improper statements made by the state's attorney in his closing argument. It would serve no purpose to discuss this matter in detail. In the manner in which the trial court deals with claims of improper argument, it exercises a large discretion. *Lebas* v. *Patriotic Assurance Co.*, 106 Conn. 119, 122, 137 Atl. 241; *DeLucia* v. *Kneeland*, 108 Conn. 191, 193, 142 Atl. 742; *State* v. *Murphy*, 124 Conn. 554, 568, 1 Atl. (2d) 274. The trial court in this case, while not specifically referring to the particular statements of which the defendant complained, gave in its charge to the jury a general caution that they should not be misled by statements of counsel not supported by the evidence, that they should decide the case solely upon the evidence and the law given them by the court, and that no sympathy or prejudice should influence their conclusion. The most serious criticism is of the statement by the state's attorney that Silberman started to commit perjury before the grand jury, but after about an hour, some papers were shown to him which convinced him that to lie further was not only dangerous but futile. Except for the incidental statement as to some papers being shown him, the statement was in substantial accord with testimony offered at the trial. We are not able to find that the trial court abused its discretion in not taking further or more drastic action or that the argument contained matter of such potential prejudice to the rights of the defendant that he should be granted a new trial.

The defendant contends that he should not have

been put to trial on an indictment charging him with two separate conspiracies, one with Silberman and one with Cooke. Joinder of counts for different offenses against the same person is specifically authorized by statute; General Statutes, §§ 6451, 6530; and such joinder cannot be regarded as in itself so prejudicial to a defendant as to make a trial upon the information or indictment improper. If the counts were in this case misjoined, the defendant is not now, after verdict, entitled to relief. It does not appear that this claim was ever made at the trial; *State* v. *Rocco,* 109 Conn. 571, 573, 145 Atl. 47; nor does it affirmatively appear that the defendant was prejudiced in his defense upon the merits or that, because of the joinder, substantial justice was not done to him. Practice Book, § 310(d).

The only other matters requiring discussion involve substantially the same considerations. One is the request to charge the jury that if they found that either of the conspiracies alleged or the agreements constituting them had occurred more than five years before the date of the indictment, the Statute of Limitations, General Statutes, § 6559, barred the prosecution. The offenses with which the defendant was charged fell within the class of high crimes and misdemeanors at common law, provision for the punishment of which is within the purview of § 6500 of the General Statutes as amended. *Fimara* v. *Garner,* 86 Conn. 434, 85 Atl. 670. In that section the maximum punishment provided for such offense was imprisonment in the state prison for not more than five years, but by an amendment which took effect July 1, 1937, this maximum was increased to not more than fifteen years. General Statutes, 1937 Sup., § 870d. There can be no reasonable question that the various payments to the defendant by Cooke and Silberman were made in pursuance of mutual designs which had their origin at the

time of the first transactions with them respectively, and that these mutual designs continued through the duration of the relationship of the parties with reference to the Merritt Parkway. The Statute of Limitations would not begin to run until the last overt act was committed. "But when the plot contemplates bringing to pass a continuous result which will not continue without continuous coöperation of the conspirators to keep it up, and there is such continuous coöperation, it is a perversion of natural thought and of natural language to call such continuous coöperation a cinematographic series of distinct conspiracies, rather than to call it a single one." *United States* v. *Kissel*, 218 U. S. 601, 607, 31 Sup. Ct. 124; *People* v. *Link*, 365 Ill. 266, 280, 6 N. E. (2d) 201; 97 A. L. R. 137. As there is no question but that the division of commissions by both Silberman and Cooke continued well into the five-year period before the indictment was filed, the Statute of Limitations did not bar the prosecution and the trial court did not err in refusing to give the charge requested.

As has been noted, § 6500 of the General Statutes fixed as the maximum punishment for the crime charged, five years imprisonment, but on July 1, 1937, an amendment to the statute took effect which increased the maximum penalty to fifteen years imprisonment. The trial court, paying no regard to the fact that the indictment charged two offenses, sentenced the defendant to a minimum term of three years and a maximum term of seven years in the state prison. We cannot regard this sentence otherwise than as imposed upon one only of the two counts. It may well be that as a conspiracy is a continuing offense and certain of the payments to the defendant by Cooke were made after July 1, 1937, the sentence would have been legal if we could find that it had been imposed upon

the count charging the conspiracy with him. See *Samuels* v. *McCurdy*, 267 U. S. 188, 193, 45 Sup. Ct. 264. But the state does not claim that any payments were made by Silberman to the defendant on or after that date; there is nothing to show a continuance of the conspiracy with him after the last payment was made; and we cannot assume that it did thereafter continue. To sentence the defendant upon the count charging a conspiracy with Silberman for a term beyond that provided in § 6500 of the General Statutes would be in violation of the constitutional guarantee against ex post facto laws. United States Constitution, Article First, § 10; *Beazell* v. *Ohio*, 269 U. S. 167, 169, 46 Sup. Ct. 68; *State* v. *Sanford*, 67 Conn. 286, 289, 34 Atl. 1045; 11 Am. Jur. 1176. As there is no means of determining upon which count the sentence was imposed and it might have been upon the count charging the conspiracy with Silberman, we cannot hold it to be valid. The error in a sentence does not, however, affect the verdict and the case can be remanded for the rendition of a new judgment upon that verdict, which will be in conformity with law.

There is error only as regards the sentence imposed, the judgment is set aside, and the case remanded for the rendition of a judgment upon the verdict in accordance with law.

In this opinion the other judges concurred.