STATE V. GILBERT MINNICK and MILDRED MINNICK.

STATE V. GILBERT MINNICK, MELVIN F. DOWNING, WILLIAM V. CHARLTON, ALBERT L. REVERDITO, and RONALD H. THERKILDSEN.

STATE V. RAYMOND EMORY, FRANCIS L. CONLEY, WILLIAM V. CHARLTON and RONALD H. THERKILDSEN.

STATE V. RONALD H. THERKILDSEN.

*(September* 28, 1960.)

Storey, J., sitting.

*Januar D. Bove, Jr.,* Attorney-General, and *Max S. Bell, Jr.,* Deputy Attorney-General, for the State.

*John Biggs, III*, and *John Merwin Bader* for defendants, Gilbert Minnick, Mildred Minnick, Melvin Downing and Raymond Emory.

*David B. Coxe, Jr.*, for defendant, William V. Charlton.

*Anthony F. Emory* for defendant, Albert L. Reverdito.

*Donald W. Booker* for defendants, Francis L. Conley and Ronald H. Therkildsen.

Superior Court for New Castle County, Nos. 620, 621, 622 and 623, Cr. A., 1959.

STOREY, J.:

The four indictments in this case were returned by the New Castle County Grand Jury as the result of various depredations against the house and property of George and Lucille Rayfield in Collins Park, New Castle County, Delaware.

At the conclusion of an investigation, the State Police arrested the various defendants and took them before a magistrate, where they were charged and subsequently released on bond. Thereafter, the same defendants were subpoenaed to appear before the Grand Jury which was then investigating the Collins Park incidents. The Grand Jury interrogated the defendants and various other witnesses on September 22 and 23, 1959. The subject indictments were returned on September 23rd. At present, the sole question before this Court is the validity of these indictments.

Six questions have been raised by the various motions to quash. One question, raised by Mr. Biggs and Mr. Bader, relative to charging different individuals with different crimes within one indictment, has apparently been abandoned. Another question, raised by every defense attorney except Mr. Booker, was certified to our Supreme Court. That question was concerned with whether the Grand Jury was a legally

constituted body at the time it returned the subject indictments.

The following three questions of law were certified for hearing and determination:

"1. Of how many members did the Grand Jury for New Castle County consist on September 22 and September 23, 1959?

"2. If the Grand Jury for New Castle County on September 22 and September 23, 1959, consisted of other than fifteen members, were the indictments returned against the defendants in the within matters valid?

"3. Can a New Castle County Grand Jury validly operate under any circumstances with less than fifteen members in attendance?"

After hearing and determination, the Supreme Court interpreted the said three questions as follows:

"1. Interpreting the first certified question as raising the question of the legal effect of the excuse by the trial court of one of the Grand Jurors prior to September 22, 1959, the answer to the question is: Fourteen.

"2. Interpreting the second certified question as raising the question whether the indictments referred to were invalidated by reason of the reduction of the Grand Jury, the answer is: The indictments were not for that reason invalid.

"3. Interpreting the third certified question as raising the question whether fifteen Grand Jurors must always be in attendance to validate the proceedings of the New Castle County Grand Jury, the answer is: The Grand Jury can validly operate in certain circumstances with fewer than fifteen members in attendance."

The opinion of the Supreme Court, 164 *A.* 2d 173, is to be filed at a later date.

Thus, only four questions remain to be adjudicated at this time.

I. Mr. Biggs and Mr. Bader, in their briefs for defendants Gilbert Minnick, Mildred Minnick, Melvin Downing and Raymond Emory, advance the contention that the third degree burglary indictments[1] are inadequate and must be quashed, because they fail to specify the particular crime which was intended to be committed once the breaking and entry had been effected. The question becomes: Is the intent aspect of a burglary indictment properly averred by charging as "* * * intent to commit *a crime* therein", or must the particular crime be specified?

The statutory definition of third degree burglary, 11 *Del. C.* § 394, is as follows:

"Whoever breaks and enters the dwelling house of another, under circumstances not amounting to burglary in the first or second degrees, *with intent to commit any crime therein*, whether such intent be executed or not, is guilty of burglary in the third degree and a felony, and shall be imprisoned not more than 15 years." (Emphasis added.)

---

[1]Cr. A. 620, 1959, Count I charges G. Minnick with third degree burglary on 2 Aug. 1959, and Count III charges M. Minnick with third degree burglary in that she aided and abetted G. Minnick in his burglary of 2 Aug. 1959. Cr. A. 621, 1959, Count I charges G. Minnick and M. Downing with third degree burglary on 7 Apr. 1959, while Count IV charges W. Charlton, A. Reverdito and R. Therkildsen with third degree burglary in that they aided and abetted G. Minnick and M. Downing in the latter's burglary of 7 Apr. 1959. It must be noted that the motion which raised the issue at bar was advanced by Mr. Biggs and Mr. Bader on behalf of those defendants charged in Counts I and III of 620 and Count I of 621. The respective attorneys for defendants charged in Count IV of 621 have not raised the issue in question. It stands to reason, however, that should the first three counts be invalid the fourth must be equally invalid. Therefore, to prevent manifest injustice, the Court will of its own motion render unto the defendants charged within Count IV of 621 whatever benefits may accrue to them by virtue of the Biggs and Bader arguments.

It is obvious that the indictment counts in question, insofar as the language now pertinent is concerned, were drafted in close reliance upon the above emphasized statutory language, with the sole exception being that the general phrase "any crime" was changed to the somewhat more limited phrase "a crime". At this time, it seems appropriate to review some of the general principles of drafting code indictments under the new rules.

"Under Rule 7(c) [*Del. C. Ann.*] an indictment * * * must be a plain, concise and *definite* written statement of the *essential facts* constituting the offense charged. The indictment * * is sufficient if it *clearly* informs the defendant of the *precise* offense with which he is charged so that he may *prepare his defense* and so that a judgment thereon will *safeguard him from a subsequent prosecution* for the same offense. *Every* ingredient or essential element of the offense should be alleged.

     \*     \*     \*     \*     \*     \*

"It is not essential that the offense be charged in the language of the statute * * *. An indictment * * for a statutory offense however, *may* ordinarily be laid in the language of the statute, *unless* the statute omits an essential element of the offense or includes it only by implication, in which case the indictment should allege it directly and with certainty. * * *

     \*     \*     \*     \*     \*     \*

"Good and careful draftsmanship is still important. The indictment * * should be *definite, certain* and *unambiguous*. * * * There is no magic formula. Common sense will be a better guide than arbitrary and artificial rules."[2] (Emphasis added.)

---

[2] *4 Barron, Fed. Pract. & Pro.* (Rules Ed.) Sec. 1914.

■ This quotation expresses the general standard by which code indictments are to be measured under our new rules. The indictment may follow the statutory language as long as the end result will satisfy the other requirements above set forth. The question then becomes, what are the standards of precision, et cetera, as above referred to, that are required of a valid burglary indictment so as to give a defendant adequate notice and protect him from subsequent prosecutions? With reference to the intent element, it is the generally accepted rule that the:

*"Particular felony[3] intended to be committed* in the unlawful breaking and entering *must be alleged.* It is not sufficient to aver an unlawful breaking and entering with an intent to commit *one* of the felonies mentioned in a designated statute, or a specified section of the code, under which the indictment is drawn, or to allege an attempt to commit *a* felony, the nature of which is to the grand jurors unknown.[4] (Emphasis added.)

* * * * * *

"This is the general rule of the adjudicated cases and the only safe course for the pleader to follow. The mere allegation of an intent to commit a felony, is a mere conclusion of the pleader. The facts constituting the elements of the particular felony need not be alleged, it being sufficient to name the felony; * * *."[5]

---

[3]For an indictment under 11 *Del. C.* § 394, a "crime" must have been intended to be committed, ergo in the quoted language and in subsequent quotes "felony" when used in such context, may, for our purposes, be considered to mean "crime".

[4]1 *Wharton's Crim. Pro.* (10th Ed.) Sec. 465, p. 543. See also Sec. 466 and cases cited therein.

[5]*Id.* Sec. 466, p. 545.

This general rule has been the law in Delaware for at least 120 years. In *State v. Eaton, Oyer & Term, Kent*, 1840, 3 *Harr., Del.*, 554, the Court said:

"Burglary is a very technical crime; the breaking and entry are entirely technical, and different from the usual understanding of breaking and entry; but *the law makes another ingredient necessary, the intent to commit* murder, rape, robbery or *some* other felony.[6] *The intent then is of the essence* of the offense, and *the prosecution must point the intent*[7] and prove that it was for the purpose of committing some *specific felony; * * *.*" (Emphasis added.)

Because of the above quoted rules and principles, I must conclude that the subject counts in the respective indictments[8] are invalid and must be quashed. The intent element of a burglary indictment requires that the *specific* crime intended to be committed must be set forth. This ancient requirement is not lessened by the liberal spirit of our new rules, for in order to conform with the standards set forth in Rule 7(c) the statement of the charge must still be a definite expression of the essential facts which clearly informs the defendant of the precise offense with which he is charged. Though the defective language was a virtual quote from the statute, it was marred by ambiguity and indefiniteness. The statutory language merely indicates that crime would be burglary regardless of what crime the person intended to com-

---

[6]See footnote 3 *supra*.

[7]See *Saxton's* case, 1836, 2 *Harr., Del.*, 533. There, a burglary indictment charged a breaking and entering of a store and a stealing of certain goods. The court held "That it is not necessary the indictment should charge that the breaking, etc., was *with intent to commit a larceny;* it is sufficient to aver that he broke and entered, and *stole* the articles charged." (Emphasis the Court's.) Here, however, we do not have such an averment.

[8]See footnote 1, *supra*, for the counts, indictments and defendants involved.

mit, but this cannot be understood to mean that an indictment of an individual may charge him with an intent to commit "any" crime therein. The ambiguity is not resolved by merely singularizing the reference to "a" crime. The specific crime, or perhaps crimes, must be clearly and specifically set forth, otherwise, we would have a situation only slightly less ambiguous than in an indictment which simply charged a man with the "commission of a crime" without naming the crime.

In concluding this question, there is one further observation I would like to make. Each count in an indictment must normally be considered as an individual unit, as though it were a separate indictment standing by itself. In doing this, I have found the subject counts to be defective. Future draftsmen should, however, take note of the fact that such individualized consideration would not have been necessary had the simple device of cross referencing been employed as sanctioned by Rule 7(c) in the following language:

"Allegations made in one count may be incorporated by reference in another count."

I note that immediately following each of the subject defective counts is a count charging the appropriate defendant or defendants with the commission of a particular and specific misdemeanor, to-wit: "Malicious mischief over $100.00 in violation of *Title* 11, *Section* 691 *of the Delaware Code of* 1953." These said misdemeanors were committed on the respective nights in question, by the respective defendants, at the site in question. Had the defective counts merely included some reference to the respective and subsequently set forth misdemeanor charges, the fatal ambiguity in the defective counts would not have existed.[9] Because of the de-

---

[9]Reference should be made to *State v. Manluff,* 1866, 1 *Houst. Cr. Cas.* 208, wherein it is held that: "In general, the intent may be presumed from what the accused does in the house after breaking and entering it; if he commits a felony (crime), it may fairly be presumed that he broke and entered it for that purpose; * * *."

gree of precision a defendant may justly demand of a criminal indictment, and because of the adverse and highly undesirable precedent it would create, I do not find myself able to correct this fatal omission by reading into the defective counts a phrase of such pervasive importance. A defendant has a right to rely on the phraseology of the indictment, and is not required to inferentially supply an omission resulting from somewhat less than precise draftsmanship in behalf of the State. It does no good to imply, as the State seems to have done, that the defendant may well know what "crime" the State had in mind. Any such implication flies in the face of the presumption that the accused is innocent and without knowledge of the facts charged.

II. As in question I, this issue was raised by Mr. Biggs and Mr. Bader. However, Raymond Emory is the only one of their several clients involved in this issue. The co-defendants involved with Emory under this indictment are Francis L. Conley, William V. Charlton and Ronald H. Therkildsen.

This particular problem involves the sufficiency of the indictment in Criminal Action No. 622, 1959. The indictment reads in pertinent part as follows:

(Defendants are charged by the Grand Jury)

"* * * with the following offense, a Misdemeanor: Conspiracy, in violation of *Title* 11, *Section* 105 *of the Delaware Code of* 1953:"

(In that they) "* * * did unlawfully, conspire, confederate and agree together, one with the other, to violate the criminal laws of Delaware *by wilfully and maliciously setting on fire and burning the* dwelling house of * * *" (the Rayfields). (Emphasis added.)

The emphasized language is crucial for, in essence, the defendant Emory contends that it is impossible to tell whether the indictment charges a conspiracy to commit first degree

arson (11 *Del. C.* § 351), second degree arson (11 *Del. C.* § 352), malicious mischief over $100 (11 *Del. C.* § 691), or malicious mischief under $100 (11 *Del. C.* § 692).

Relative to indictments for criminal conspiracy, it is said in Wharton:

"Like the combination itself, * * *, the object or purpose of the combination must be clearly and fully set forth in language appropriate and sufficient to show that the object to be accomplished or the end to be attained was and is unlawful, stating the particular crime or offense to be accomplished.[10]

*     *     *     *     *     *

"*Statutory offense* charged as the object sought to be accomplished, the purpose of the conspiracy must be set out in such a manner as to show clearly that it falls within the prohibition of the statute; but it is not necessary to describe the offense intended to be committed as fully and with the particularity required in an indictment in which his (*sic.*) commission is charged."[11]

Upon this background as well as the language quoted in problem I relative to indictments in general, I make the following observations. The phrase "by *wilfully* and *maliciously setting on fire* and *burning* the *dwelling house* of" a named person, contains all the elements of an indictment for arson in the second degree, as defined in 11 *Del. C.* § 352, to-wit:

"Whoever *wilfully* and *maliciously burns* or *sets on fire* any *dwelling house,* whether it is his own or that of another, in which there is not at the time a human being, is guilty of arson in the second degree * * *."

---

[10] 1 *Wharton's Crim. Pro.* (10th Ed.) Sec. 515, p. 612.

[11]*Id.* p. 614.

That phrase in the indictment adheres so closely to the statutory definition of arson in the second degree that it is a most adequate and precise aversion of the criminal object or purpose in the alleged conspiracy. Truly, the draftsman did not use the phrase "arson in the second degree", or quote the statutory designation, but such was not required. He had an alternative, and chose to set forth the facts necessary to produce the same result. The technical statutory name for the "objective" crime could have been used as could its section number in the code, but such usage is only *required* for the primary crime—Conspiracy—and in that instance it was properly employed.[12]

It is beyond question that the elements of first degree arson are not charged, and hence the indictment does not charge a conspiracy to commit that crime.

Because I see the indictment as being more than adequate to charge a conspiracy to commit the crime of second degree arson, I am at a loss to understand why the State failed to make this point in its brief. Rather than do this, however, it tacitly admits that the proposed objective was not first degree arson. It goes on to admit that there is no aversion of property damage in excess of $100, ergo the objective is not averred to have been malicious mischief in violation of 11 *Del. C.* § 691. The State's brief writer then concludes that:

"* * * The only question is whether the essential elements of a crime are charged. Defendant himself answered this question in the affirmative as to malicious mischief under $100. 'Destroy or injure' could be done by burning, he admits, and there is no reference to value being over $100, so the alle-

---

[12]"Error in the citation or its omission shall not be ground for dismissal of the indictment * * * if the error or omission did not mislead the defendant to his prejudice." Rule 7(c), Del. Rules Crim. Pro.

gations as to object of the conspiracy fit the definition of at least this crime. Defendant neatly answers his own question as to what crime is being alleged as the object of the conspiracy, and also demonstrates that all the essential elements of that crime are charged.

"Since the essential elements test is met, it is unnecessary to speculate whether the essential elements of arson in the second degree are also alleged. * * *"

This argument has some merit, since the conspiracy would be none the less a conspiracy with an alleged objective of violating Sec. 692 as of violating Sec. 352. But in using its quoted analysis, the State has tended to lead the defendant to express the belief in his reply brief that he:

"understands that the State will seek to prove and will pray this Court to charge on the destruction or injury to property valued at less than $100.00 (11 *Del. C.*, Sec. 692)."

Though I find that the indictment itself is clear and concise, I feel the State's quoted analysis has been productive of some confusion. In attempting to resolve this confusion, I must state that the Grand Jury has returned an indictment for Conspiracy to commit the crime of second degree arson. Had it intended to charge the "objective" crime as being malicious mischief under $100, it would not have used the phrase "setting on fire and burning". That destruction and injury of property can be done by such a method is unquestioned. But when such methods are employed "wilfully and maliciously" against a "dwelling house" then the offense becomes arson—if no one is in the building at the time it is arson in the second degree. So, therefore, the State has the burden of proving a conspiracy to commit such a crime, and the defense should be prepared to meet such proof. Stated somewhat differently, Arson in the second degree may also be malicious mischief under $100, but not necessarily vice versa. The former is the "objective" crime here, not the latter.

It will not be adequate for the State to meet the *onus pro-bandum* of the latter alone; since the former is the one charged in the indictment, the former must be proved for the State to prevail.

■ The indictments are valid to charge the crime of conspiracy to commit arson in the second degree, and because of this, the malicious mischief aspect is moot.

III. This question is raised by Mr. Booker on behalf of his clients, Conley and Therkildsen. The problem turns around the fact that the Attorney General, Mr. Bove, and his deputy, Mr. Bell, were, on certain occasions, both present at the same time in the same room where the Grand Jury was then engaged in investigating the circumstances that gave rise to the indictments[13] *sub judice.*

■ Specifically, therefore, the problem is: Does the *Joint presence of both* the Attorney General and his deputy before the Grand Jury during the conduct of its investigation of certain crimes, invalidate those indictments returned as the result of said investigations conducted in the joint presence of said Attorney General and his deputy? It is to be noted that we have no question of an unauthorized presence during the deliberation or voting of the Grand Jury. We are only concerned with that stage of the proceedings when the witnesses were being heard by the Grand Jury.

Rule 6(d) of our Rules of Criminal Procedure states that:

"The Attorney General, the witness under examination, interpreters when needed and, for the purpose of taking the evidence, a stenographer may be present while the grand jury

---

[13]Between themselves, Conley and Therkildsen appear in the indictments for Cr. A. Nos. 621-623, 1959, inclusive. However, whatever merit their attorney's arguments may have, would be equally valid for Cr. A. No. 620, 1959.

is in session, but no person other than the jurors may be present while the grand jury is deliberating or voting."

The defendants point out that the rule refers to the Attorney General in the singular number, ergo their contention that to have said Attorney General and his deputy both present is a plurality which is violative of the rule.

To counter this contention, the State refers to Rule 54 (c), wherein it is provided that:

"As used in these rules, * * * 'Attorney General' shall include any Deputy Attorney General; * * *."

With reference to this rule, the State then goes on to argue that:

"If defendants were correct, Rule 54 would instead provide merely that the Attorney General's position could be taken by a deputy from time to time. However, it does define the term 'Attorney General' as including more than one person, thus answering defendant's argument. This is consistent with 1 *Del. C.* Sec. 304(a) which provides that words in the singular include the plural."

I am moved to accept the State's argument, especially in light of the following definition of "include":

"To comprehend or comprise, as a genus the species, the whole a part, * * *; to take or reckon in; to contain; embrace; * * *."[14]

For the purposes of the question *sub judice,* I hold that the word "include" in Rule 54(c) has a pluralizing effect on the term "Attorney General" as it appears in Rule 6(d), so as to require said term be read as "Attorney General and/or any Deputy Attorney General". The plurality *per se* did not invalidate the indictments.

---

[14]*Webster's New Inter. Dict.* (2d Ed.) p. 1258.

Many of the cases construing the word "include" and its various derivations, have considered the question of whether the word was one of enlargement or limitation.[15] I do not feel it necessary or desirable to touch on that question at this time. The question would be most significant should a special prosecutor attempt to appear before the Grand Jury. I also feel it unnecessary to construe the word "any" as it appears in connection with "Deputy Attorney General". But I observe that at least it means one deputy, if not more.

The defendants have urged that the weight of numbers as to the Attorney General's office had a prejudicial effect on their cause. They offer no factual showing to back up this contention, and I do not feel inclined to speculate on not impossible circumstances that seem at best somewhat remote. I do not mean to close the door to similar arguments in future cases where there is a more substantial showing of a *prima facie* case of prejudice. I merely observe that considering this case *sui generis* there is no showing of prejudice *per se* or specifically. Furthermore, I do not find it unusual that the Attorney General might well feel the need for at least one assistant to aid him in organizing the mass of testimony and witnesses heard by the jurors on the two days in question.[16] There is no affirmative showing that the Attorney General's office abused its privilege in this case.

Defendants' other arguments grouped under this point are equally without merit. The indictments are not invalidated.

■ IV. This last question has been raised on behalf of each defendant by their respective attorneys. Reduced to its essence, the problem poses the question of whether or not

---

[15] 20 *A Words & Phrases,* Include, pp. 152-157.

[16] There were 28 witnesses heard on September 22, 1959, and 13 on September 23.

the defendants were denied their privileges against self-incrimination as guaranteed by Act I, Sec. 7 of the Delaware Constitution of 1897, *Del. C. Ann.* The defendants refer to the fact that they had already been formally charged before a magistrate and released on bail. This was a well publicized fact. The very crimes with which they had been charged before the magistrate were identical to those which were being investigated by the subject Grand Jury. Because of this situation, it was a violation of their constitutional guarantees to subpoena them to testify before the Grand Jury.

In support of this contention, the defendants offer several cases and various arguments. It is not necessary for the purposes of this opinion to review either. Suffice it to say that I concede that a situation such as outlined could give rise to a variety of fatal abuses. If such a witness were not advised of his privilege of self-incrimination, the indictments might thus be rendered invalid. Should the witness have been coerced, the indictments would have been invalid. These possibilities are manifest. But the difficulty here, is that the record before me is devoid of any positive evidence such as would be required to raise such possibilities to the dignity of an assured fact. I am not free to conjure up images of possible abuse. I must have a reasonable assurity of abuse. In the absence of affirmative evidence to the contrary, I am forced to presume that all the legal safeguards were adhered to. I feel my position on this matter is most secure in view of the procedure available to defendants, who allege irregularities before the Grand Jury, to have the record of the proceedings before that body brought before the Court for review. This procedure is outlined in Rule 6(c)[17] of our Rules of Criminal Procedure. To this date, the defendants have not requested the Court to order such a disclosure. Without such affirmative

---

[17]Refer to *In re Jessup's Petition, Super.* 1957, 11 *Terry, Del.,* 530, 540, 136 *A.* 2d 207, 213 for analysis of this procedure.

evidence upon which to judge, I am at a loss to entertain defendants' arguments, which seem to ask me to substitute speculation for fact.

Insofar as it may be argued that the mere issuance of subpoenas was *per se* a violation of the privilege, I refer to the following language in *State v. Kemp, Sup. Ct. of Er. Conn.* 1939, 126 *Conn.* 60, 9 *A.* 2d 63, 69-70, of which I approve:

"The defendant appeared before the grand jury as a witness in answer to a subpoena and testified. He contends that thereby he was denied the immunity guaranteed under the constitutional provision that 'in all criminal prosecutions, the accused * * * shall not be compelled to give evidence against himself.' *Conn. Const.* Article I, § 9, * * *. The immunity guaranteed by the constitution no doubt extends to proceedings before a grand jury. *Counselman v. Hitchcock,* 142 *U. S.* 547, 12 *S. Ct.* 195, 35 *L. Ed.* 1110; * * * (other cases). That immunity does not, however, at least in a situation where a grand jury is carrying on a general investigation, protect a person from being summoned before it and questioned, but it only gives him the right to claim immunity from answering any particular question which may be put to him. Of the Fifth Amendment to the United States Constitution, U. S. C. A., the Circuit Court of Appeals of the Second Circuit, in words equally applicable to the provision in our own constitution, citing numerous cases, has said: 'The final contention of the appellant is that, regardless of the details of his examination, it was a violation of his rights under the Fifth Amendment to require him to be sworn and examined before the grand jury, because its investigation, though ostensibly general, was in reality an attempt to secure from his own mouth evidence upon which to indict him. Some judicial support may be found for such a view. * * * But it has not prevailed generally. * * * As Prof. Wigmore has aptly said, the constitutional provision is "an option of refusal and not a prohibition of inquiry." Were it otherwise, any suspect would

be sacrosanct, and witnesses most likely to know the facts would refuse any aid to an investigation of the crime. The mere summoning of a witness before the grand jury gives no basis for the assumption that his constitutional privilege will be impaired. His duty is to answer frankly until some question is propounded, the answer to which might tend to self-incrimination.' *O'Connell v. United States,* 2 *Cir.,* 40 *F.* 2d 201, 205."

In approving the above quoted language for the case at bar, I also note that the Deputy Attorney General, Mr. Bell, has filed a sworn affidavit that to the best of his knowledge all eight defendants were represented by counsel prior to their appearance before the Grand Jury. This averment has not been denied. There is nothing to rebut the presumption that their own attorneys advised them of their respective rights. I also consider the Grand Jury investigation of a rather broad scope. It was investigating the possibility of a *prima facie* case in a variety of crimes occurring on four distinct dates over a period of several months wherein at least several defendants might be subjected to indictment. Because of the paucity of evidence before me due to defendants' failure to move for a disclosure of the record, I do not even know whether any individual defendant was asked any particular question respecting a crime for which he was subsequently indicted. And if he should have been, I do not know whether or not he waived his privilege or claimed it. I cannot presume irregularities. The indictments are not shown to be invalid and so will stand.

On presentation, Order, in conformity with this decision, will be entered.