STATE OF CONNECTICUT *v.* MEYER BILLER
(9727)

SPEZIALE, C. J., PETERS, PARSKEY, SHEA and GRILLO, Js.

Argued March 8—decision released July 5, 1983

*M. Mitchell Morse,* with whom, on the brief, were *Howard A. Jacobs* and *Karen F. Tross,* for the appellant (defendant).

*Julia D. Dewey,* assistant state's attorney, with whom, on the brief, were *Arnold Markle,* state's attorney, and *Mary M. Galvin,* assistant state's attorney, for the appellee (state).

PARSKEY, J. The defendant, Meyer Biller, a licensed public adjuster and a notary public, was charged in a two-count information with falsely certifying two oaths in violation of General Statutes § 53-368. The case was tried to a jury and the defendant was found guilty on both counts. The court imposed consecutive eighteen month to three year sentences on each count for a total

effective sentence of not less than three, nor more than six years, from which judgment the defendant has appealed.

Although the testimony was contradictory, the jury could reasonably have found the following facts: On April 13, 1975, and April 18, 1975, suspicious fires heavily damaged an apartment building located at 66–68 Norton Street in the city of New Haven. The property was an asset of the Bridgehaven Corporation, a closely held corporation controlled by Peter and Marilyn Cappola.

Peter Cappola, a key state's witness, had insured the property for approximately $580,000. Prior to the date of the fires, the Cappolas had retained the defendant for the purpose of settling claims with insurance companies. Also prior to the date of the April 13, 1975 fire, Peter Cappola advised Biller that a fire would in fact occur. Cappola admitted setting the April 13, 1975 fire, but denied any involvement in the April 18, 1975 fire.

Biller proceeded to adjust claims arising out of both fires. He and his son, Lawrence Biller, prepared a detailed survey itemizing the damage and replacement costs. Before the expiration of the deadline for filing proofs of loss with the insurance company, Biller provided Peter Cappola with two proof of loss forms and instructed Cappola to take them home and get his wife's signature. Cappola took the forms home. There the Cappolas signed one blank form for each fire. These signed but otherwise blank forms were then submitted to the defendant's office. The Cappolas were unaware of the amounts claimed in the proofs of loss until after their submission to the insurer. Neither Peter nor Marilyn Cappola took an oath concerning the claims submitted.

Gerald Hale, the insurance company adjuster, received the proofs with a cover letter from the defendant and sent them on to the insurer. When Hale received the proof of loss statements, they were completely filled in with no blank lines remaining on the forms. The forms were signed by the defendant as a notary. The damages claimed were $538,180.58 for the April 13 fire and $123,206.60 for the April 18 fire. Hale, who had examined the Norton Street structure soon after both fires and on subsequent occasions, considered the claims excessive. It was Hale's opinion that $225,000.00 and $75,000.00 were proper figures for the first and second fires respectively. Additionally there was evidence that the defendant had inflated the figures by twenty percent and that he had charged a fee of ten percent of the settlement.

The defendant has pressed seven claims of error on appeal. At issue is (1) whether the trial court erred in admitting into evidence, for the purpose of rebuttal, statements allegedly compelled from the defendant by an investigative grand jury; (2) whether the oath on a proof of loss form is one required by law as is necessary to sustain a conviction pursuant to General Statutes § 53-368; (3) whether the defendant's right to counsel was violated when the police secretly recorded his conversations after he had been arrested and had retained counsel for other charges arising out of the same grand jury investigation; (4) whether testimony offered by the defendant concerning structural replacement cost was properly excluded from evidence; (5) whether evidence of the usual practice within the insurance industry regarding damage estimates offered by the defendant was properly excluded; (6) whether the court erred in restricting the defendant's cross-examination of two government witnesses and (7) whether the court properly charged the jury.

## I

The defendant claims that the trial court erred in admitting into evidence, for the purpose of rebuttal, statements allegedly compelled from the defendant by an investigative grand jury.

In contradiction of the testimony of Marilyn and Peter Cappola, the defense offered the testimony of Florence Biller and Lawrence M. Biller (the defendant's wife and son), corroborated in part by other witnesses. Lawrence Biller testified that the Cappolas signed duplicate sets of proofs of loss at the defendant's office where the defendant notarized them. On cross-examination, Lawrence Biller was questioned about the ordinary course of business at Biller Associates concerning the filling out and execution of proofs of loss. He stated that they ordinarily filled out an original plus one — one for the insurance company and one for their records. He denied that it was the usual course to have them filled out, including the notary date, prior to signing and stated that the Cappola proofs had been filled out except for the date, before signing.

The state, in rebuttal, offered two excerpts[1] from the defendant's testimony before Judge Levine sitting as

---

[1] The defense had offered testimony in contradiction of Peter and Marilyn Cappola. Thereafter, in rebuttal, the state introduced, over objection and exception, two statements made by the defendant when he testified before an investigating grand jury. The statements, in the form of excerpts from the grand jury transcript, were introduced as a state's exhibit and were as follows:

(3/3/76)

"Q. So was it common procedure for the corporation, I'm asking you, Sir, to get blank proof of losses signed not indicating for what date or what area or what type of occurrence?

"A. It happens."

(3/4/76)

"Q. Do you normally have Proofs of Loss that are unfilled in signed by the insured and acknowledged by you?

"A. Mr. Markle, I don't normally have anything. I do things many

a one man grand jury investigating incidents of arson in the New Haven area. The defendant had been subpoenaed to the grand jury to produce his corporate records.[2] Biller appeared before the grand jury on nine different days between October 9, 1975, and March 12, 1976. When questioned about his own activities on behalf of the corporation, Biller asserted his constitutional privilege against self-incrimination. The grand juror ordered him to answer the questions because they involved actions which the defendant might have taken in a corporate capacity regardless of whether the answers would implicate the defendant personally. This ruling was established by Judge Levine on the defendant's first day of testimony before the grand jury and was reaffirmed on every subsequent day of testimony up to and including March 2, and March 4, when the defendant gave the statements that were later introduced at trial.

On appeal the defendant claims that the trial court erred in admitting statements allegedly compelled from the defendant by the investigative grand jury in violation of his fifth amendment rights. In his brief the defendant adopts a two stage analysis. First, the defendant asserts that the grand juror erred when he ordered Biller to give incriminating testimony about his own activities on behalf of the corporation; and second, the defendant argues that the trial court erred in finding that the admitted statements were not involuntary or compelled under the circumstances.

The state does not seriously challenge the first step of the defendant's analysis. The state contends, however, that the defendant waived his fifth amend-

different ways. The only purpose of the way I work and do things is from my memory, from my recollection, from my records, and for me to know and for my purposes, not for any other purpose."

[2] Biller Associates is a close corporation. At the time of the grand jury investigation the defendant was the president of the corporation.

ment right by failing to raise the privilege prior to giving the statements that were later introduced at trial. The state does not concede that the grand juror's alleged error necessarily rendered the defendant's statements inadmissible at trial.

The privilege against compulsory self-incrimination extends to proceedings before a grand jury. *State* v. *Kemp,* 126 Conn. 60, 72, 9 A.2d 63 (1939). The federal fifth amendment standards were made applicable to the states in *Malloy* v. *Hogan,* 378 U.S. 1, 11, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964); *State* v. *Simms,* 170 Conn. 206, 209, 365 A.2d 821, cert. denied, 425 U.S. 954, 96 S. Ct. 1732, 48 L. Ed. 2d 199 (1976). "[The fifth amendment] can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory; and it protects against any disclosure that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar* v. *United States,* 406 U.S. 441, 444–45, 92 S. Ct. 1653, 32 L. Ed. 2d 212, reh. denied, 408 U.S. 931, 92 S. Ct. 2478, 33 L. Ed. 2d 345 (1972).

That a corporation has no fifth amendment privilege is long established and is not disputed here. See *Hale* v. *Henkel,* 201 U.S. 43, 26 S. Ct. 370, 50 L. Ed. 652 (1906). Nor is it seriously questioned that the grand juror erred when he compelled the defendant to answer questions in his "corporate capacity" where the answers may have been personally incriminating to the defendant. The determinative law was enunciated by the United States Supreme Court in *Curcio* v. *United States,* 354 U.S. 118, 77 S. Ct. 1145, 1 L. Ed. 2d 1225 (1957).[3] Therein, the court stated that "A custodian,

[3] In *Curcio* v. *United States,* 354 U.S. 118, 77 S. Ct. 1145, 1 L. Ed. 2d 1225 (1957), the United States Supreme Court reversed a contempt conviction holding that the custodian of a union's books and records who had failed to produce them before a federal grand jury pursuant to a subpoena, could, on fifth amendment grounds, lawfully refuse to answer questions asked by the grand jury as to the whereabouts of the books and records. See *United States* v. *Rylander,* 460 U.S. 752, 103 S. Ct. 1548, 75 L. Ed. 2d 521 (1983).

by assuming the duties of his office, undertakes the obligation to produce the books of which he is custodian in response to a rightful exercise of the State's visitorial powers. But he cannot lawfully be compelled, in the absence of a grant of adequate immunity from prosecution, to condemn himself by his own oral testimony." Id., 123–24. The court, citing *Wilson* v. *United States*, 221 U.S. 361, 385, 31 S. Ct. 538, 55 L. Ed. 771 (1911), further noted that: " 'They [the custodians of corporate records] may decline to utter upon the witness stand a single self-criminating word. They may demand that any accusation against them individually be established without the aid of their oral testimony or the compulsory production by them of their private papers.' " (Bracketts in original.) Id., 124. The defendant as the president of Biller Associates had voluntarily assumed a duty which overrode his claim of privilege *only* with respect to the production of the corporate records themselves. The grand juror, therefore, erred by compelling incriminating oral testimony from the defendant in his "corporate capacity."

We turn now to the second stage of the defendant's analysis. The defendant claims that the trial court erred in admitting statements compelled from him by the grand jury in violation of his fifth amendment rights. The state claims that the defendant waived his fifth amendment privilege by failing to raise it by objection prior to giving the two statements that were later admitted at trial. The trial court found that the defendant's statements were not involuntary or compelled under the circumstances.

Based on our examination of the grand jury transcript, it is indisputable that Biller raised his fifth amendment privilege on numerous occasions during the course of his testimony. Further, it is indisputable that

the grand juror continuously sustained the privilege personally but ordered Biller to answer in his "corporate capacity."[4] Although only two brief excerpts of

[4] The following excerpts are typical of what transpired throughout Biller's grand jury testimony:

(10/16/75)

"The Court: Well, as I understand the issue which Mr. Markle is raising, that in his corporate capacity there exists no privilege, am I correct? Is that your argument?

"Mr. Markle: Yes, your Honor.

"The Court: In the corporate capacity, there is no privilege which exists for records, certainly, and for any action which he may have taken in the corporate capacity."

(3/2/76)

"[By Mr. Markle:] Did you have a conversation with Nardini about burning George Street?

"[Mr. Biller:] I won't answer that.

"Q. Did you ever have a conversation with Nardini in your corporate capacity as to how George Street had come to be burned?

"A. I won't answer that, Your Honor. That would reflect on individual integrity and everything else and I will repeat, as I said before, it's a closed corporation, the operation and intermingling between personalities, corporate is so fine a line that anything that can be possibly be interpreted to be incriminating in any way, I would invoke the Fifth Amendment.

"The Court: Yes. Well, you're not allowed to invoke the Fifth Amendment on behalf of the corporation. The question is asked on behalf of the corporation. You will have to answer it.

"The Witness: Then the corporation will have to speak for itself.

"The Court: You're the corporation, you speak for it.

"The Witness: I'm an employee.

"The Court: As far as you know, did the corporation ever have a discussion with Mr. Nardini with respect to burning George Street?"

(3/3/76)

"Q. In terms of those two checks, Mr. Biller, did the corporation pay $5,500 to Mr. Grudberg? What business did it have with Mr. Grudberg, the corporation?

"A. Your Honor, I again would take the Fifth Amendment on behalf of the corporation unless the State's Attorney can show that it's germane to this investigation.

"The Court: Now, please, whether it's germane to the investigation is not the question. The only question that you have a right to object to is one which involves you in a crime. This is the corporation. It does not have the protection of the Fifth Amendment, therefore, you will have to answer the question.

"The Witness: Your Honor, if I might state further:

Biller's testimony were later admitted at trial, our review necessarily requires that we examine the statements in context. The first question and answer incorporated in the state's exhibit occurred during Biller's testimony before the grand jury on March 3, 1976. The statement and the colloquy immediately preceding and following are set out in the footnote below.[5] During his colloquy the state's attorney ques-

---

"The Court: Yes, go right ahead.

"The Witness: Some transactions in that checkbook and this, for one, takes place at my personal direction, therefore I'm answerable to it personally and on that basis I will take the Fifth Amendment on answering that question.

"The Court: You take it personally. Now, you answer on behalf of the corporation, what were those checks issued for?

"The Witness: They were issued at the direction of Meyer Biller."

[5] The following is an excerpt from the defendant's testimony before the grand jury on March 3, 1976. The italicized excerpts were subsequently incorporated in an exhibit that was introduced by the state, in rebuttal, at the defendant's criminal trial.

By Mr. Markle:

"Q. The proof of loss. The statement of proof of loss. You now handed me—that's two. All right, the one statement in proof of loss. Incidentally, Sir, in this file, there are in addition to that, I want you to see—will you hold those so I can open the file. There is a statement, proof of loss on the Meyer Associates.

"A. On the Biller Associates.

"Q. I'm sorry, on the Biller Associates, Licensed Adjustor. That's signed by Mr. Nardini, proof of loss, right, as president?

"A. That's correct.

"Q. It's from your file?

"A. D J Investments, Incorporated, by Dante Nardini.

"Q. It's in your file?

"A. Correct.

"Q. What's that got reference to, what fire?

"A. I don't know.

"Q. What vandalism?

"A. I don't know.

"Q. Do you normally walk around with a blank signed proof of loss?

"A. It depends.

"Q. Is that a common practice to get a series of proof of losses signed by a client?

"A. Are you talking about the corporation obtaining them?

tioned Biller about what appeared to be two signed blank proof of loss forms in a Biller Associates file. When asked about the first blank signed proof of loss, Biller claimed his fifth amendment privilege personally. The state's attorney then questioned Biller about the actions of the corporation and Biller answered. Biller was then asked as a "corporate officer" if the proof of loss came from the Biller Associates file; to which he responded affirmatively. The state's attorney then asked the question that along with Biller's answer was later introduced at trial:

"So was it common procedure for the corporation, I'm asking you, Sir, to get blank proof of losses signed not indicating for what date or what area or what type of occurrence?"

"A. It happens."

Immediately thereafter Biller was asked if it (the proof of loss) was in anticipation of something happening. Biller objected and the grand juror ordered him to answer in his "corporate capacity."

"Q. Let's take you, first, do you claim the Privilege on that?
"A. I claim the Privilege.
"Q. Now, how about the corporation?
"A. It happens.
"Q. Well, it happened here.
"A. For various reasons.
"Q. What?
"A. I see it here. There it is. It speaks for itself.
"Q. That's from your file, isn't it?
"A. It speaks for itself.
"Q. There's no question that was in the Biller Associates file?
"A. It speaks for itself. It's there.
"Q. Sir, I'm asking you as a corporate officer, is that from the Biller Associate file?
"A. You're showing me the file. It's coming out of the file. It apparently is.
"Q. And there is a second one that's blank, isn't there?
"A. Correct.
"Q. That also came out of the file?
"A. Correct.
"Q. *So was it common procedure for the corporation, I'm asking you, Sir,*

Clearly this entire colloquy was infected by the grand juror's erroneous ruling on the applicability of Biller's fifth amendment privilege. That Biller was compelled to incriminate himself is manifest.[6] " '[A] witness protected by the privilege may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant. *Kastigar* v. *United States,* 406 U.S. 441, 92 S. Ct. 1653, 32 L. Ed. 2d 212 [reh. denied, 408 U.S. 931, 92 S. Ct. 2478, 33 L. Ed. 2d 345] (1972). Absent such protection if he is nevertheless compelled to answer, his answers are inadmissible against him in a later criminal prosecution. *Bram* v. *United States,* [168 U.S. 532, 18 S. Ct. 183, 42 L. Ed. 568 (1897) ]; *Boyd* v. *United States,* [116 U.S. 616, 6 S. Ct. 524, 29 L. Ed. 746 (1886) ]'; *Lefkowitz* v. *Turley,* 414 U.S. 70, 78, 94 S. Ct. 316, 38 L. Ed. 2d 274 (1973)." *Garner* v. *United States,* 424 U.S. 648, 653, 96 S. Ct. 1178, 47 L. Ed. 2d 370 (1976).

---

*to get blank proof of losses signed not indicating for what date or what area or what type of occurrence?*

"A. *It happens.*

"Q. What is it, in anticipation of something happening?

"A. I wouldn't say that, Your Honor. I would object to that question.

"The Court: Answer that question, in your corporate capacity.

"The Witness: It's in anticipation of nothing.

By Mr. Markle:

"Q. Well, then, Sir, what purpose would two proofs of loss both signed D J Investments, Inc. by Dante Nardini, Jr., President, have in a file with nothing else indicating no number, no policy, no date, no loss?

"A. At this point, I can't tell you why that's in there. I don't recall why it was done." (Emphasis added.)

[6] Even assuming arguendo that the specific question and answer later admitted at trial were not the specific subject of a fifth amendment claim by Biller we would reach the same result. It is obvious that, at this stage of the proceeding, there was no fifth amendment claim which Biller could have made that had any prospect of being fully honored. It was perfectly clear from the previous rulings of the court that any such claim would be futile. Under the circumstances, Biller's failure to claim the privilege cannot reasonably be interpreted as a waiver. *State* v. *Higgs,* 143 Conn. 138, 145, 120 A.2d 152 (1956); see *Krause* v. *Almor Homes, Inc.,* 147 Conn. 333, 336, 160 A.2d 753 (1960).

Because we find that admitting Biller's March 3 statement in his subsequent trial was error, we need not consider the admission of the March 4 statement as it was an inseparable component of the state's exhibit. Further, it is apparent that the improperly admitted evidence contradicted the testimony of the defense witnesses on one of the central issues in the case, namely, whether the proofs of loss were signed by the Cappolas at home, in blank, or in front of the defendant in his office. Because it is evident from our examination of the record and transcript that credibility was crucial in this case; *State* v. *Ouellette,* 190 Conn. 84, 103–104, 459 A.2d 1005 (1983); we cannot say that the error was harmless.

## II

By amended jury information the defendant was charged, pursuant to General Statutes § 53-368, with two counts of falsely certifying that he had administered an oath to Marilyn Cappola, on sworn statements in proof of loss filed with the Affiliated F.M. Insurance Company of Rhode Island. It was further alleged that the sworn statements in proof of loss were required by General Statutes § 38-98. In his second claim of error, the defendant asserts that the oath on the proof of loss form contemplated by the particular insurance policy involved herein is not one "required by law" necessary to sustain a conviction pursuant to General Statutes § 53-368.[7] The state maintains,

---

[7] "[General Statutes] Sec. 53-368. FALSELY CERTIFYING AS TO ADMINISTRATION OF OATH. Any person authorized by the laws of this state to administer oaths and affirmations, who falsely certifies that an oath or affirmation has been administered by him to any person in any matter where an oath or affirmation is by law required or falsely certifies that any affidavit, deposition or written statement of any kind required by law to be made upon oath or affirmation has been sworn or affirmed to before him by the person making such affidavit, deposition or written statement in any case where the same is required by law to be made, shall be fined not more than one thousand dollars or be imprisoned not more than three years or both."

however, that sections 38-99 (a)[8] and 38-98 mandate that a proof of loss in conjunction with a fire insurance policy be signed and sworn to by the insured.

[8] In pertinent part, General Statutes § 38-99 provides:

"Sec. 38-99. PROVISIONS OF POLICY OR CONTRACT. (a) No policy or contract of fire insurance shall be made, issued or delivered by any insurer or any agent or representative thereof, on any property in this state, unless it conforms as to all provisions, stipulations, agreements and conditions with the form of policy set forth in section 38-98. There shall be printed at the head of such policy the name of the insurer or insurers issuing the policy, the location of the home office thereof, a statement showing whether such insurer or insurers are stock or mutual corporations or are reciprocal insurers or Lloyd's underwriter, provided any company organized under special charter provisions may so indicate upon its policy and may add a statement of the plan under which it operates in this state, and there may be added thereon such device or devices as the insurer or insurers issuing such policy desire. Such policy shall be clearly designated on the back of the form as "The Standard Fire Insurance Policy of the State of Connecticut"; and this designation may include the names of such other states as have adopted this standard form. The standard fire insurance policy provided for in section 38-98 need not be used for effecting reinsurance between insurers. If the policy is issued by a mutual, cooperative or reciprocal insurer having special regulations with respect to the payment by the policyholder of assessments, such regulations shall be printed upon the policy and any such insurer may print upon the policy such regulations as are appropriate to or required by its form of organization. Insurers issuing the standard fire insurance policy pursuant to section 38-98 are authorized to affix thereto or include therein a written statement that the policy does not cover loss or damage caused by nuclear reaction or nuclear radiation or radioactive contamination, all whether directly or indirectly resulting from an insured peril under such policy; provided nothing herein contained shall be construed to prohibit the attachment to any such policy of an endorsement or endorsements specifically assuming coverage for loss or damage caused by nuclear reaction or nuclear radiation or radioactive contamination.

"(b) Any policy or contract which includes, either on an unspecified basis as to coverage or for an indivisible premium, coverage against the peril of fire and substantial coverage against other perils need not comply with the provisions of subsection (a) hereof, provided (1) such policy or contract shall afford coverage, with respect to the peril of fire, not less than the substantial equivalent of the coverage afforded by said standard fire insurance policy, (2) the provisions in relation to mortgagee interests and obligations in said standard fire insurance policy shall be incorporated therein without change, (3) such policy or contract is complete as to all of its terms without reference to any other document and (4) the commissioner is satisfied that such policy or contract complies with the provisions hereof."

The defendant advances three principal contentions. He argues that because the insurance commissioner can, pursuant to General Statutes § 38-99 (b), approve insurance policies not utilizing the standard form, the oath set forth in § 38-98 is not required by law. He also contends that the requirement in the standard form fire insurance policy that the proof of loss be sworn to is only a model contract provision, not a matter required by law for § 53-368 purposes and that after acceptance by the parties a policy of fire insurance in the form prescribed by the legislature is not to be treated as a legislative enactment but rather as a private contract. He contends finally that because the insurance company can waive the proof of loss requirement the oath set forth in § 38-98 is not required by law.

In order to analyze the defendant's first contention we must establish the statutory framework. Section 53-368 prohibits the false certification of an oath that is required by law. See *State* v. *Tedesco*, 175 Conn. 279, 397 A.2d 1352 (1978). General Statutes § 38-98[9] sets

[9] Section 38-98 of the General Statutes provides in relevant part:

"Requirements in case loss occurs. The insured shall give immediate written notice to this Company of any loss, protect the property from further damage, forthwith separate the damaged and undamaged personal property, put it in the best possible order, furnish a complete inventory of the destroyed, damaged and undamaged property, showing in detail quantities, costs, actual cash value and amount of loss claims; AND WITHIN SIXTY DAYS AFTER THE LOSS, UNLESS SUCH TIME IS EXTENDED IN WRITING BY THIS COMPANY, THE INSURED SHALL RENDER TO THIS COMPANY A PROOF OF LOSS, signed and sworn to by the insured, stating the knowledge and belief of the insured as to the following: the time and origin of the loss, the interest of the insured and of all others in the property, the actual cash value of each item thereof and the amount of loss thereto, all encumbrances thereon, all other contracts of insurance, whether valid or not, covering any of said property, any changes in the title, use, occupation, location, possession or exposures of said property since the issuing of this policy, by whom and for what purpose any building herein described and the several parts thereof were occupied at the time of loss and whether or not it then stood on leased ground, and shall furnish a copy of all the descriptions and schedules in all policies and, if required, verified plans and specifications of any building, fixtures or machinery destroyed or damaged. The insured, as often as may be

forth the standard form fire insurance policy for the state of Connecticut. Section 38-99 (a) provides, inter alia, that "[n]o policy or contract of fire insurance shall be made, issued or delivered by any insurer or any agent or representative thereof, on any property in this state, unless it conforms as to all provisions, stipulations, agreements and conditions with the form of policy set forth in section 38-98. . . ." Section 38-99 (b), however, excludes certain fire insurance policies from the ambit of §§ 38-99 (a) and 38-98, if those policies meet the requirements set forth in § 38-99 (b) to the satisfaction of the insurance commissioner. Only policies which either on an unspecified basis as to coverage or for an indivisible premium provide coverage against the peril of fire and substantial coverage against other perils are eligible for inclusion in § 38-99 (b). In order to be relieved from compliance with § 38-98 these policies (1) must afford coverage with respect to the peril of fire not less than the substantial equivalent of the coverage afforded by the standard fire policy; (2) must incorporate the provisions in relation to mortgagee interests and obligations as set forth in the standard policy without change; (3) must be complete as to all terms without reference to any other document; and (4) the commissioner must be satisfied that the policy complies with these requirements.[10] See General Statutes § 38-99 (b).

reasonably required, shall exhibit to any person designated by this Company all that remains of any property herein described, and submit to examinations under oath by any person named by this Company, and subscribe the same; and, as often as may be reasonably required, shall produce for examination all books of account, bills, invoices and other vouchers, or certified copies thereof if originals be lost, at such reasonable time and place as may be designated by this Company or its representative, and shall permit extracts and copies thereof to be made."

[10] We do not perceive the commissioner's function as merely ministerial. We doubt that the commissioner would abuse his discretion by refusing to approve a policy pursuant to General Statutes § 38-99 (b) that failed to provide the substantial equivalent of the standard policy. By way of example only, if a policy were to contain a provision that the insurer would not have to pay a loss for six months rather than the sixty days provided by the standard form, the commissioner would not be obliged to approve it.

The defendant claims that because the insurance commissioner can approve insurance policies not in compliance with the standard form, the oath prescribed by that form is not required by law for § 53-368 purposes. We are unpersuaded. Assuming without deciding that the insurance policy herein involved met the first three requirements enumerated in § 38-99 (b), the record before us provides no indication that the policy satisfies the fourth criteria, viz., there is no showing that the insurance commissioner is satisfied that the policy complies with § 38-99 (b). This would preclude the operation of § 38-99 (b) in the present case.

It follows, therefore, that the instant policy falls within § 38-99 (a) which provides that "[n]o policy or contract of fire insurance shall be made, issued or delivered by an insurer or any agent or representative thereof, on any property in this state, unless it conforms as to all provisions, stipulations, agreements and conditions with the form of policy set forth in section 38-98. . . ." The defendant gains nothing on this claim.

The defendant next claims that § 38-98 establishes only a model contract provision and is not to be treated as a legislative enactment once the policy has been accepted by the parties. He asserts that on this basis the oath set out in § 38-98 cannot be by law required for the purposes of a prosecution pursuant to § 53-368. In support of this contention the defendant cites a series of older cases. Principally the defendant relies on the decisions in *Shawnee Mut. Fire Ins. Co.* v. *School District*, 44 Okl. 3, 143 P. 194 (1914), *Reed* v. *Washington Fire & Marine Ins. Co.*, 138 Mass. 572 (1885), and *Dunton* v. *Westchester Fire Ins. Co.*, 104 Me. 372, 71 A. 1037 (1908). These cases establish the general proposition that " '[a] policy of fire insurance in the standard form prescribed by . . . [the

legislature] . . . is not to be treated as a legislative enactment after it has been accepted by the parties, but as a voluntary contract, which, like any other contract, derives its force and efficacy from the consent of the parties . . . .' " *Shawnee Mut. Fire Ins. Co.* v. *School District,* supra, 8; see *Reed* v. *Washington Fire & Marine Ins. Co.,* supra, 577; *Dunton* v. *Westchester Fire Ins. Co.,* supra, 378.

We find these cases to be inapposite. As a preliminary observation we note that all of the above-referenced cases as well as our own decisions indicate that the provisions of the standard policy are required or prescribed by law. In *Shawnee Mut. Fire Ins. Co.* v. *School District,* supra, the court (p. 8) noted that "[t]he terms and provisions of the standard policy of fire insurance, the use of which is *required by legislative enactment,* are to be considered as employed in the sense in which they were used and interpreted by the courts before that form of policy was adopted." (Emphasis added.) The court in *Reed* v. *Washington Fire & Marine Ins. Co.,* supra, 577, noted that "it is not to be presumed that the Legislature intended, *by prescribing the form of contract,* and prohibiting any other, to give it effect in depriving a party of rights which, as a contract, it would not have." (Emphasis added.) In *Dunton* v. *Westchester Fire Ins. Co.,* supra, 378, the court indicated that the Maine standard policy was "prescribed by statute." Finally this court, in *Covenant Ins. Co.* v. *Banks,* 177 Conn. 273, 277–78, 413 A.2d 862 (1979), stated that the appraisal clause set forth in General Statutes § 38-98 was both "required" and "mandated" to appear in a contract of fire insurance. See also General Statutes § 38-99 (a).

The cases cited by the defendant focus not on whether the standard policy is required by law, indeed they assume that fact, but rather on how the particular

policy is to be interpreted, viz., either in terms of statutory construction or contract law. Faced with that issue the cases have determined only that the standard policy is to be interpreted as a contract and not a statute. The decisions determine nothing more. On the contrary, they are strong authority for the proposition that the terms of § 38-98 are required by law.

The defendant's final assertion is that because the insurance company could waive the proof of loss, the oath thereon is not one required by law. Based on our decision in *State* v. *Tedesco,* supra, 285–87, we reject this claim. In *Tedesco* the defendant was charged pursuant to § 53-368 with falsely certifying the administration of an oath on an application for the renewal of a liquor permit. The defendant in *Tedesco* claimed that if the liquor permit renewal application was insufficient or defective for any reason, the liquor commission would lack jurisdiction to act on the renewal in which case the oath in question would not be required by law. The court found this position to be untenable. The court noted that where the permit was valid as to the commission, the club and the permit holder because the parties had agreed to the procedure, the defendant (who had notarized the permit application) had no standing to object because when making the certification he knew the application would be filed with the commission for action thereon.

Likewise, we conclude that the defendant in the present case is without standing to object. He cannot raise the insurance company's right to waive the proof of loss as a defense. The insurer and the insured were acting pursuant to an agreed upon contractual procedure. The defendant was not a party to this contract. The proof of loss was submitted to the insurance company in accordance with the policy. The proofs of loss were certified with knowledge that they would be forwarded

to the insurer and, indeed, the defendant himself sent the forms to the insurer. *State* v. *Tedesco,* supra, 287.

Our limited holding, therefore, is that the oath prescribed by General Statutes § 38-98 is one required by law for the purposes of a prosecution pursuant to General Statutes § 53-368.

## III

Because they are likely to arise at retrial, we consider the defendant's remaining claims of error. The defendant next urges that his right to counsel guaranteed by the sixth amendment to the United States constitution and article first, § 8 of the constitution of Connecticut was violated when his conversations were secretly recorded after he had been arrested and retained counsel for other charges arising out of the same grand jury investigation.

In February, 1977, the grand juror filed with the court his report of the investigation of fires, thefts and vandalisms which had occurred in eighteen New Haven buildings. Relying on this report, the state applied for a warrant charging the defendant with criminal mischief and aiding a larceny in connection with the burning of a building at 80 Winchester Avenue in the city of New Haven. The warrant was issued on March 23, 1977, and the defendant was arrested on March 29, 1977. Counsel entered an appearance for the defendant on March 29, 1977.

In April, 1977, after Biller's arrest on the criminal mischief and larceny charges, he was engaged by Peter Cappola in a conversation while Cappola was wearing a "body mike." Cappola was acting in concert with the police. This conversation was recorded and transcribed by the police. Thereafter, the state, in November, 1977, relying on the grand juror's report, sought and obtained

a warrant for the defendant's arrest on the charges that he falsely certified the administration of oaths. The warrant was issued on November 16, 1977, and the defendant was immediately arrested. Defense counsel appeared in that case on November 21, 1977. During the defendant's trial on the false oath charges, portions of the transcripts and the tapes of the Biller-Cappola conversations relating to the Norton Street fires were admitted into evidence over the defendant's objection.

The defendant claims that incriminating statements were elicited from him after the start of adversary criminal proceedings and after he had retained counsel. He asserts that since the grand jury report provided all of the basis necessary to establish probable cause for the criminal mischief, aiding larceny and false oath charges, the state violated his right to counsel by eliciting statements from him through an informant after he had been arrested and had obtained counsel on the criminal mischief and aiding larceny charges. The defendant maintains that, in view of the factual background of the grand jury investigation, the false oath charges were not separate and distinct matters.

We find these claims unpersuasive.[11] "The right to counsel attaches 'at or after the initiation of adversary

[11] To the extent that the defendant is suggesting that he had a right to be arrested for all charges arising from the grand jury investigation at the same time, he is in error. "There is no constitutional right to be arrested. The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the fourth amendment if they act too soon, and a violation of the sixth amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction." *Hoffa* v. *United States*, 385 U.S. 293, 310, 87 S. Ct. 408, 17 L. Ed. 2d 374, reh. denied, 386 U.S. 940, 951, 87 S. Ct. 970, 17 L. Ed. 2d 880 (1966); *United States* v. *Marion*, 404 U.S. 307, 325n, 92 S. Ct. 455, 30 L. Ed. 2d 468 (1971). Nor are the police required to reveal all their cards in an application for an arrest warrant.

judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' *Kirby* v. *Illinois,* 406 U.S. 682, 688–89, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972)." *State* v. *Ledbetter,* 185 Conn. 607, 609, 441 A.2d 595 (1981).

Unlike *Massiah* v. *United States,* 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964), the present case does not involve the use of incriminating statements made by an indicted defendant out of the presence of counsel to prove the charges pending against the defendant. Rather, the evidence of the conversations taped after Biller's arrest was used as proof in the later charged false oath prosecution. *Massiah* and its progeny establish that constitutional rights are violated where the government covertly gathers admissions of some past wrongdoing of which a suspect already stands accused, while different or subsequent criminal acts may be secretly investigated even though the target is under suspicion of another earlier crime. *United States* v. *Calhoun,* 669 F.2d 923, 925 (4th Cir.), cert. denied, 456 U.S. 946, 102 S. Ct. 2014, 72 L. Ed. 2d 469 (1982); see *United States* v. *Capo,* 693 F.2d 1330, 1339 (11th Cir. 1982); *United States* v. *Missler,* 414 F.2d 1293, 1303 (4th Cir. 1969), cert. denied, 397 U.S. 913, 90 S. Ct. 912, 25 L. Ed. 2d 93 (1970); *United States* v. *Diamond,* 492 F. Sup. 583, 586 (D. Md. 1980), aff'd, 660 F.2d 996 (4th Cir. 1981).

*Massiah* offers no basis for the exclusion of testimony relating to uncounseled, post-indictment statements that involved criminal acts or constituted criminal acts in themselves. Such statements, even though elicited by government agents after indictment and in the absence of counsel, may form the basis for a separate or superseding indictment and may be offered to prove such additional charges. *United States* v. *Osser,* 483

F.2d 727, 730–34 (3d Cir.), cert. denied, 414 U.S. 1028, 94 S. Ct. 457, 38 L. Ed. 2d 321 (1973); *United States* v. *Missler*, supra, 1302-1303. A defendant indicted for one offense is not immunized from accountability for statements uttered subsequently tending to prove another crime. *United States* v. *Calhoun*, supra, 925.

Nor are we persuaded by the defendant's claim that the false oath charges were not separate and distinct from the earlier criminal mischief and aiding larceny charges because they all arose out of the same grand jury investigation and report. The false oath charges encompassed the defendant's alleged false certification of an oath on proof of loss forms signed by Peter and Marilyn Cappola relating to two fires which had occurred at 66–68 Norton Street in a building owned by the Bridgehaven Corporation, an entity controlled by the Cappolas. The premises were insured by the Affiliated F.M. Insurance Company of Rhode Island. The criminal mischief and aiding larceny charges, however, encompassed property damage and claims submitted therefor relating to property located at 80 Winchester Avenue, in a building owned by D & J Investments Incorporated of which Dante Nardini was president. The premises were insured by the Covenant Insurance Company. We cannot find that these different crimes involving different owners, different insurance companies, and different participants were not separate and distinct solely because the prosecution arose out of the same grand jury investigation. The evidence elicited from the defendant and subsequently admitted at trial did not violate the defendant's sixth amendment right to counsel.[12]

---

[12] In past decisions we have not specifically accorded the right to counsel guaranteed by article first, § 8 of the constitution of Connecticut a broader application than that guaranteed by the sixth amendment to the federal constitution. See *State* v. *Boulay,* 189 Conn. 106, 112-18, 454 A.2d 724 (1983); *State* v. *Derrico,* 181 Conn. 151, 167-69, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980). Nor, given the circumstances of this case, are we inclined to consider whether the Connecticut constitution is to be so construed.

## IV

The defendant claims that the court erred when it excluded expert testimony proffered by the defense on the subject of the 1975 replacement cost of the Norton Street premises. The defendant's witness, Sabino Panca, indicated that he had viewed the structure in 1979. The court ruled that the defense had not laid a proper foundation for the admission of the expert testimony on the subject of the 1975 replacement cost of the building in that the defense had not demonstrated that the building was in the same condition when Panca viewed it as it was in 1975.

The trial court has wide discretion in ruling on the admissibility of expert testimony and this discretion is not to be disturbed unless that discretion has been abused, or the error is clear and involves a misconception of the law. *Going* v. *Pagani,* 172 Conn. 29, 35, 372 A.2d 516 (1976). An expert's knowledge must be directly applicable to the matter specifically in issue. *Going* v. *Pagani,* supra, 35; *Siladi* v. *McNamara,* 164 Conn. 510, 513–14, 325 A.2d 277 (1973). It is essential that the expert's personal knowledge or observation shall have been reasonably contemporaneous with the thing or occurrence in controversy; knowledge gained or observations made long subsequent thereto, after a material change of conditions is insufficient. 2 Jones, Evidence (6th Ed.) § 14:20, p. 638; *State* v. *Auclair,* 33 Conn. Sup. 704, 713–14, 368 A.2d 235 (1976).

Herein, there had been testimony earlier in the trial that the owner had expended just over $100,000 in the fall of 1976 "to completely remodel the building top to bottom." Even accepting, arguendo, the defendant's claim on appeal that because the insurance contract was a replacement policy only structural modifications were pertinent, we cannot conclude that the court abused

its discretion, in light of the testimony, by requiring the defense to establish that the building was in substantially the same condition when Panca viewed it in 1979 as it was in 1975. The uncertainties in the essential facts were such as to make an opinion based on them without substantial value. *Sears* v. *Curtis,* 147 Conn. 311, 314–15, 160 A.2d 742 (1960); *Floyd* v. *Fruit Industries, Inc.,* 144 Conn. 659, 666, 136 A.2d 918 (1957).[13]

The defendant's further claim that he was barred from establishing a foundation for the admission of Panca's testimony is simply without merit. The witness, Panca, was asked whether there had been additions or deletions to the structure over the preceding ten years which could affect the replacement cost. Insomuch as the defense had failed to establish that the witness had been in the building before 1979, he was not competent to answer. The defendant was not, however, barred from producing this evidence through other witnesses; and, indeed, the court even suggested what was needed to establish a foundation.

Additionally, the defendant claims that error occurred during the cross-examination of an independent insurance adjuster, Gerald Hale, who testified on behalf of the state. As an expert witness, Hale gave two opinions apparently relevant to whether the defendant had the necessary intent to deceive. See *State* v. *Tedesco,* supra, 291. He testified (1) that the estimates of fire damage on the proofs of loss submit-

---

[13] We do not consider today's opinion to be in conflict with our decision in *F. P. Carabillo Construction Co.* v. *Covenant Ins. Co.,* 172 Conn. 564, 567–68, 375 A.2d 1029 (1977). That case involved a suit on a fire insurance policy. At issue was what damage was caused by fire and what damage was caused by vandalism and deterioration. On that issue the lapse of time between the fire and the inspection by the defendant's witness did not preclude the admissibility of his opinion. On the facts the court held that the time lapse, if anything, favored the plaintiff.

ted by the defendant were excessive and (2) that his own much lower estimates were correct. On cross-examination he testified that it was "kind of usual" for public adjusters representing fire loss claimants to give estimates exceeding the estimates of fire losses which he would make on behalf of insurance carriers. A further question about the usual industry practice which is followed when such a disparity appears between the claimant and the insurer over the extent of the fire loss was excluded. The court also sustained the state's objection to additional inquiries about prior negotiations between the witness and the defendant over fire loss claims on other properties. The defendant excepted to these rulings upon the ground that the common practice of public adjusters to maximize fire loss estimates was not essentially different from that of lawyers who initially present claims of damages far in excess of the amounts they ultimately accept in settling those claims for their clients.

The defendant claims that the industry custom as followed in prior dealings between him and Hale under similar circumstances was relevant upon the issue of fraudulent intent. Because the state relied upon the fact that the damage estimates of the defendant were substantially higher than those of the witness, evidence of a common practice for public adjusters to overstate and for insurance company adjusters to understate such losses had some bearing on the question of intent. Because we have ordered a new trial we do not consider whether this ruling alone would constitute reversible error.

The defendant's remaining claims of error focus on an evidentiary ruling made by the court as well as the refusal of the court to charge as requested by the defendant. It is sufficient to note that we have exam-

ined these claims carefully and conclude that they are without merit. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Cole,* 189 Conn. 518, 538, 457 A.2d 656 (1983).

General Statutes § 53-368 proscribes the false certification of an oath. The intent to deceive required by this statute relates to whether the oath or affirmation was sworn or affirmed before the defendant by the person making the affidavit, deposition or written statement. The evidence adduced at trial concerning the contents of the proofs of loss other than those portions relating to the oath and certification by the defendant, while relevant to show that the defendant's deception with respect to the oath was part of a greater deception to defraud the Cappolas' insurer, was not essential to establish violation of the statute. See *State* v. *Tedesco,* supra, 288–89.

There is error, the judgment is set aside and a new trial is ordered.

In this opinion SPEZIALE, C. J., PETERS and GRILLO, Js. concurred.

SHEA, J. (concurring and dissenting). I agree fully with Parts I, III and IV of the court's opinion. My disagreement is only with Part II of the opinion, which concludes that the oath upon the proof of loss form was "required by law" within the meaning of General Statutes § 53-368. I fail to comprehend how an oath on a proof of loss under a fire policy can be said to be "required by law" when General Statutes § 38-99 (b) provides that policies without a provision for an oath on a proof of loss are permissible if they contain the three essentials specified: (1) fire coverage equivalent to the standard fire policy; (2) the standard form provisions in relation to mortgagee interests and obligations; and (3) completeness as to all terms without

reference to other documents. The fourth condition, that the commissioner be satisfied that the policy "complies with the provisions hereof," confines the discretion of the commissioner to ascertaining whether the prior three conditions have been met by the proposed policy. The commissioner would not be authorized to insist upon a provision for oaths upon proofs of loss, because such a provision could not reasonably be deemed necessary to implement fulfillment of the three essential requirements specified by § 38-99 (b), none of which pertains to proofs of loss.

Since it is optional for an insurance company to include a provision for an oath on a proof of loss in a policy after obtaining commissioner approval, which cannot be withheld merely because of the absence of an oath, such an oath is not "required by law." It cannot be contended that oaths which are called for only by the terms of an agreement are "required by law." The legislature obviously did not intend to include all oaths within the ambit of § 53-368, but imposed the "required by law" limitation so that it would apply only in those situations deemed sufficiently important to have induced the legislators to specify an oath as essential. Presumably those would involve circumstances where some strong public policy would be implemented by the requirement of an oath and would not include those where the requirement of an oath was thought desirable merely by the parties involved. By giving the insurer the right to omit the oath on a proof of loss and to sell fire policies with or without it, § 38-99 (b) has left the decision of whether to include such a provision in a policy entirely to the parties. Since the provision is no longer an essential ingredient of a fire policy, I do not see how it can be said to be "required by law," and would remand the case with direction to render judgment dismissing the information with prejudice.